Jordan T. Smith, Esq., Bar No. 12097
JTS@pisanellibice.com
**PISANELLI BICE PLLC**
400 South 7th Street, Suite 300
Las Vegas, Nevada  89101
Telephone:  (702) 214-2100
Facsimile:  (702) 214-2101

Kevin J. Orsini (*pro hac vice pending*)
korsini@cravath.com
Antony L. Ryan (*pro hac vice pending*)
aryan@cravath.com
Brittany L. Sukiennik (*pro hac vice pending*)
bsukiennik@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Counsel for Plaintiff*
*Robinhood Derivatives, LLC*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROBINHOOD DERIVATIVES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>MIKE DREITZER, in his official capacity as Chairman of the Nevada Gaming Control Board, et al.,<br><br>Defendants. | CASE NO.:    2:25-cv-01541<br><br>**Plaintiff Robinhood's Motion for a Temporary Restraining Order and Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof**<br><br>(Oral Argument Requested) |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND.....................................................................................................4

    A.    Event Contract Regulation by the CEA and CFTC ...................................4

    B.    Futures Commission Merchant Regulation by the CEA and CFTC.......................7

    C.    Robinhood, Event Contracts and Kalshi .................................................8

    D.    The Letters from the Board.......................................................................9

ARGUMENT ..............................................................................................................................11

I.    ROBINHOOD IS LIKELY TO SUCCEED ON THE MERITS.......................................11

    A.    The CEA Preempts Application of State Gaming Laws to Sports-Related Event Contract Trading on CFTC-Designated Exchanges. ...................12

    B.    The CEA's Preemption of State Gaming Laws as Applied to Sports-Related Event Contracts Includes Those Opened and Traded Through Robinhood's Platform. ..........................................................................19

II.    ROBINHOOD WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE RELIEF. .........................................................................................21

III.    THE EQUITIES AND PUBLIC INTEREST TILT STRONGLY IN ROBINHOOD'S FAVOR. ..................................................................................23

IV.    NO SECURITY—OR ONLY *DE MINIMIS* SECURITY—IS APPROPRIATE.............23

CONCLUSION ..........................................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alden v. Maine*, 527 U.S. 706 (1999) ...............................................................22

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147 (7th
    Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*,
    66 F.3d 867 (7th Cir. 1995) ...........................................................4, 5, 16

*Arizona v. United States*, 567 U.S. 387 (2012)................................................17

*Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999).................................23

*Bartels v. Int'l Commodities Corp.*, 435 F. Supp. 865 (D. Conn. 1977) .............12

*BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755 (9th Cir. 2018).........13

*Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115
    (2016) ..........................................................................................15

*Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363 (2000)................................12, 18

*Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017)..........................21

*Doe v. Horne*, 115 F.4th 1083 (9th Cir. 2024)...................................................11

*Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001) ...............16, 17

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141 (1982) ................12, 18

*Grondal v. United States*, No. 2:09-CV-18-RMP, 2020 WL 13388646 (E.D.
    Wash. Aug. 20, 2020) .....................................................................22

*Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733 (N.D. Cal. 1978)....................12, 16

*Hunter v. Fed. Energy Reg. Comm'n*, 711 F.3d 155 (D.C. Cir. 2013) ...................11

*Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039 (9th Cir. 2015) ............................22

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ................................................17

*Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213 (D. Kan. 1979)......................12, 16

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003)......................................23

*KalshiEx LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257, 2024
WL 4164694 (D.D.C. Sept. 12, 2024) ...................................................................4

*KalshiEx, LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 WL 1218313
(D.N.J. Apr. 28, 2025) .................................................................11, 14, 15

*KalshiEx LLC v. Flaherty*, No. 25-1922 (3d Cir. July 31, 2025) .................................17

*KalshiEx, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 1073495
(D. Nev. Apr. 9, 2025) ................................................................................ passim

*KalshiEx LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908 (D. Md.
Aug. 1, 2025) ...............................................................................................15

*KalshiEx LLC v. U.S. Commodity Futures Trading Comm'n*, No. 24-5205, 2024
WL 4512583 (D.C. Cir. Oct. 16, 2024) .......................................................20

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)..........................................17

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469 (9th
Cir. 2015) ...............................................................................................21, 22

*LIT Ventures, LLC v. Carranza*, 457 F. Supp. 3d 906 (D. Nev. 2020).........................11

*Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 1105 (N.D.
Ga. 1985)......................................................................................................16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982)........................18, 20

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .........................................21

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................11

*Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646 (7th Cir.
2013).............................................................................................................20

*Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580 (7th Cir. 2001) .........................13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) .................11, 22

*United States v. Arizona*, 641 F.3d 339 (9th Cir. 2011)..............................................23

*United States v. Wilkinson*, 986 F.3d 740 (7th Cir. 2021) ........................................13

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) .......................................23

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .........................................11, 21

*Witzel v. Chartered Sys. Corp. of N.Y., Ltd.*, 490 F. Supp. 343 (D. Minn. 1980) ...................12, 16

**Statutes & Rules**

7 U.S.C. § 1a(19) .................................................................................................14

7 U.S.C. § 1a(28) .............................................................................................7, 20

7 U.S.C. § 1a(47) ................................................................................................13

7 U.S.C. § 2(a)(1)(A) .................................................................................... passim

7 U.S.C. § 2(e) ......................................................................................................5

7 U.S.C. § 6f ........................................................................................................7

7 U.S.C. § 7(a) ......................................................................................................5

7 U.S.C. § 7a-2(c) ........................................................................................ passim

7 U.S.C. § 8(b) ......................................................................................................6

7 U.S.C. § 16(e)(1)(B)(i) ........................................................................................5

Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 ............................ passim

Fed. R. Civ. P. 65(c) ............................................................................................23

Nev. Rev. Stat. § 463.360(3) ............................................................................11, 21

**Other Authorities**

17 C.F.R. pt. 38 .....................................................................................................5

17 C.F.R. § 1.10 ...............................................................................................7, 20

17 C.F.R. § 1.11 ....................................................................................................8

17 C.F.R. § 1.12 ...............................................................................................7, 20

17 C.F.R. § 1.15 ...............................................................................................8, 20

17 C.F.R. § 1.14 ....................................................................................................8

17 C.F.R. § 1.17 .............................................................................................7, 8, 20

17 C.F.R. § 1.18 ....................................................................................................8

17 C.F.R. § 1.55 ...............................................................................................7, 22

17 C.F.R. § 1.71 ...............................................................................................8, 20

iv

17 C.F.R. § 3.10 ........................................................................................................7

17 C.F.R. § 17.00 ..................................................................................................7, 20

17 C.F.R. § 38.3 ........................................................................................................5

17 C.F.R. § 38.151 ....................................................................................................7

17 C.F.R. § 38.250 ....................................................................................................7

17 C.F.R. § 40.2 ........................................................................................................6

17 C.F.R. § 40.3 ........................................................................................................6

17 C.F.R. § 40.11 ................................................................................................6, 18

17 C.F.R. § 155.3 ...............................................................................................8, 20

120 Cong. Rec. 30,464 (1974) ..............................................................................5, 18

120 Cong. Rec. 34,736 (1974) ................................................................................17

120 Cong. Rec. 34,997 (1974) ................................................................................17

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) ...........................................16, 18

CFTC Brief, *KalshiEx LLC v. U.S. Commodity Futures Trading Comm'n*, No. 24-
5205, 2024 WL 4512583 (D.D.C. Oct. 16, 2024) ..............................................20

Hearings Before the Committee on Agriculture and Forestry, United States
Senate, on S. 2485, S. 2587, S. 2837 and H.R. 13113, 93d Cong., 2d Sess. 685
(1974). ...........................................................................................................4, 17

H.R. 13113, 93d Cong., 2d Sess. 685 (1974) .............................................................4

H.R. Rep. No. 93-975 (1974) .............................................................................17, 19

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in*
1974 U.S.C.C.A.N. 5894 ......................................................................................16

*KalshiEx LLC v. Flaherty*, No. 25-1922, ECF No. 66 (Brief of Amici Curiae
Seven Former Members of Congress in Support of Plaintiff-Appellee) (3d Cir.
July 31, 2025) ......................................................................................................17

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
L. Rev. 657 (1982) ................................................................................................17

S. Rep. No. 93-1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843 ................................................16

U.S. Const. art. VI, cl. 2 ..................................................................................................................13

Plaintiff Robinhood Derivatives, LLC ("Robinhood") moves this Court pursuant to Federal Rule of Civil Procedure 65 for a temporary restraining order and preliminary injunction against Defendants Mike Dreitzer, in his official capacity as Chairman of the Nevada Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada Gaming Control Board; Chandeni K. Sendall, in her official capacity as a Member of the Nevada Gaming Control Board; Nevada Gaming Control Board, a subdivision of the State of Nevada; Jennifer Togliatti, in her official capacity as Chair of the Nevada Gaming Commission; Rosa Solis-Rainey, in her official capacity as a Member of the Nevada Gaming Commission; Brian Krolicki, in his official capacity as a Member of the Nevada Gaming Commission; George Markantonis, in his official capacity as a Member of the Nevada Gaming Commission; Nevada Gaming Commission, a subdivision of the State of Nevada; and Aaron D. Ford, in his official capacity as Attorney General of Nevada.

This motion is based upon the Complaint in this action, the Memorandum of Points and Authorities contained in this document, the Declaration of James B. Mackenzie filed herewith along with its accompanying exhibits, the Declaration of Kevin J. Orsini filed herewith along with its accompanying exhibits, all matters with respect to which this Court may take judicial notice and such oral and documentary evidence as may be presented to the Court.

## PRELIMINARY STATEMENT

The Robinhood organization consists of various financial-services companies that are democratizing finance by removing barriers to access to financial markets. Robinhood Derivatives, LLC, one of the family of companies within the Robinhood organization, is a Commodity Futures Trading Commission ("CFTC")-registered futures commission merchant ("FCM") that offers its approved users the opportunity to trade, among other things, sports-related event contracts through the Robinhood platform. While Robinhood, as a registered FCM, facilitates the placement and liquidation of event contracts for its users, the contracts themselves trade on KalshiEx LLC's ("Kalshi") exchange, which is registered with the CFTC as a designated contract market ("DCM"). Thus, while Robinhood's approved users access event

contracts trading through Robinhood's platform, all actual trades occur on Kalshi's CFTC-regulated exchange.

On March 4, 2025, the Nevada Gaming Control Board ("Board") sent Kalshi a cease-and-desist letter threatening to prohibit Kalshi from facilitating any trading of sports-related event contracts in Nevada. *KalshiEx LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, ECF No. 1-2, at 2 (D. Nev. filed Apr. 9, 2025). The Board asserted that Nevada state gaming laws governed these transactions.

In response, Kalshi sought declaratory and injunctive relief from this Court, arguing that Nevada's gaming laws, as applied to trading on a CFTC-designated exchange, are preempted by the Commodity Exchange Act's ("CEA") comprehensive federal framework for regulating commodity futures and swaps trading. *Id.*, ECF No. 1. The Court granted Kalshi's motion for a preliminary injunction, holding that Kalshi demonstrated a likelihood of success on the merits, that it will likely suffer irreparable harm without relief, and that the balance of interests favors injunction. *KalshiEx LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 1073495, at *2-8 (D. Nev. Apr. 9, 2025) (hereinafter "*KalshiEx*"). Defendants are thus currently prohibited from enforcing Nevada gaming laws against Kalshi with respect to sports-related event contract transactions on its designated exchange.

Robinhood maintains that offering Kalshi's sports-related event contracts to its customers in Nevada would not violate any state laws. But in light of the cease-and-desist letter that Kalshi received, as of March 14, 2025, Robinhood has not allowed Nevada residents to enter positions for sports-related event contracts. On May 6, 2025, after this Court's decision in *KalshiEx*, 2025 WL 1073495, Robinhood met with the Board and explained that it believed it should be able to offer sports-related event contracts trading through Kalshi's exchange for as long as this Court's order in *KalshiEx* remains in effect. At the conclusion of that meeting, Board employees indicated they did not expect to be able to agree to refrain from enforcement action against Robinhood, even while the *KalshiEx* order is in place. They stated that they would contact Robinhood if they ultimately reached a different conclusion, and to date, they have not done so.

On May 8, 2025, the Board sent Robinhood a letter stating that it would consider Robinhood's allowing Nevada customers to trade sports-related event contracts to be a violation of Nevada law.  Robinhood's voluntary compliance with the effect of the Board's letter to Kalshi and the Board's subsequent letter to Robinhood has already caused Robinhood irreparable harm, including damage to its reputation and goodwill and significant economic losses.  On May 19, 2025, Robinhood met with the Board again and sought an agreement from the State of Nevada to permit Robinhood at least temporarily to offer its customers the same sports-related event contracts that are traded on Kalshi's exchange.  The Board declined Robinhood's proposal.

In light of this Court's decision in *KalshiEx*, 2025 WL 1073495, and the Board's refusal to reach an agreement with Robinhood to mitigate the substantial ongoing economic and reputational harms Robinhood continues to suffer in the marketplace while Kalshi is permitted to trade sports-related event contracts in Nevada, Robinhood has activated its Nevada customers' access to opening new positions in sports-related event contracts.  As a result, it now faces an immediate threat of civil penalties and criminal prosecution from the Board, along with the attendant reputational harm that any enforcement proceeding by the Board would cause.

The Board has placed Robinhood in a situation that is fundamentally unfair and inconsistent with governing law.  The same transactions are at issue here as were (and are) at issue in *KalshiEx*.  All of the contracts are traded on Kalshi's exchange; the only difference between the two cases is that the online portal that customers use to submit trade orders in this case is operated by Robinhood rather than Kalshi.  But that is a distinction without a legal difference with respect to the question of preemption of Nevada's gaming laws.  Robinhood accordingly seeks the same relief this Court granted to Kalshi on the same legal basis—a temporary restraining order and preliminary injunction prohibiting Defendants from enforcing against Robinhood the same Nevada laws (and a related Nevada gaming law) that this Court has already found are likely preempted by the CEA.  Kalshi is a CFTC-designated contract market, and as this Court has found, transactions involving the sports-related event contracts traded on its exchange are subject to the exclusive jurisdiction of the CFTC.  *Id.* at *6.

**FACTUAL BACKGROUND**

**A.    Event Contract Regulation by the CEA and CFTC.**

An event contract is a type of derivative that allows customers to trade on their predictions about the occurrence of future events.  *See KalshiEx LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257, 2024 WL 4164694, at *1-2 (D.D.C. Sept. 12, 2024).  Event contracts are typically structured as binary options posing a particular yes-or-no question.  A buyer takes the "yes" side and a seller takes the "no" side, and upon the expiration of the contract—typically when the outcome of the future event in question becomes known—the value of the contract goes to the party who was right.  Until that time, buyers and sellers can trade the contract, and the price of the contract fluctuates based on the market's assessment of the probability that the event will occur.  *Id.* at *2.  Traders may use event contracts to mitigate risk (*e.g.*, an orange grower may buy a contract predicting an early frost to offset the risk of loss of income from frost damage) or simply to seek a financial return.  *Id.*  Unlike a sportsbook, where bettors place bets against the house and the house sets the odds in its favor, when traders enter into event contracts, the contracts are bilateral with another trader on the other side, and the market sets the contract price.

The CEA sets forth a comprehensive federal framework for regulating commodity futures and swaps trading.  *See KalshiEx*, 2025 WL 1073495, at *3.  In 1974, Congress established the CFTC, the federal agency that oversees and regulates commodity futures and swaps trading.  *Id.*  Congress intended to centralize regulatory authority with the CFTC to avoid the "total chaos" that could ensue if states attempted to regulate the futures markets, thereby subjecting futures trading to different regulations.  Hearings Before the Committee on Agriculture and Forestry, United States Senate, on S. 2485, S. 2587, S. 2837 and H.R. 13113, 93d Cong., 2d Sess. 685 (1974) ("Senate Hearings") (statement of Sen. Clark); *see also Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992) (setting forth legislative history of the CFTC Act of 1974), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995).  Indeed, Congress considered adding but ultimately removed from the

4

bill's final language a provision of the CEA that would have preserved parallel state authority over futures trading. *See* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). As described below, the CEA was further amended by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, which brought swaps within the coverage of the CEA and added a special rule about event contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

The CEA provides that the CFTC has "exclusive jurisdiction" over transactions involving event contracts—which, as described below, are swaps or contracts of sale of a commodity for future delivery—traded on registered exchanges (known as "designated contract markets"): "The Commission shall have exclusive jurisdiction . . . with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and *transactions involving swaps or contracts of sale of a commodity for future delivery* (including significant price discovery contracts), *traded or executed on a contract market designated pursuant to section 7 of this title . . . .*" 7 U.S.C. § 2(a)(1)(A) (emphasis added). The CEA expressly preserves state authority to regulate transactions "not conducted on or subject to the rules" of a CFTC-regulated exchange. *Id.* § 16(e)(1)(B)(i).

To receive the CFTC's designation as a contract market, an exchange must apply and set forth its ability to comply with CFTC rules and regulations. *Id.* §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The CFTC's comprehensive regulatory framework for contract markets, including a set of 23 "Core Principles," 17 C.F.R. pt. 38, is designed to ensure and protect the integrity of those markets. Status as a CFTC-designated contract market "imposes upon [an exchange] a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc.*, 977 F.2d at 1150-51. The CFTC is authorized to suspend or revoke an exchange's designation if it fails to comply with any of the provisions of the CEA or the CFTC's regulations. 7 U.S.C. § 8(b).

Kalshi, whose event contracts Robinhood makes available on its platform, is a CFTC-designated contract market.  *KalshiEx*, 2025 WL 1073495, at *1.

An exchange may submit new contracts to the CFTC for approval prior to listing; alternatively, it may self-certify the contracts as complying with CFTC requirements.  7 U.S.C. § 7a-2(c)(1), (4)(A); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c).  Generally, the CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  The CEA contains a special rule relating to CFTC review and approval of event contracts, which was added by the Dodd-Frank Act of 2010.  Pub. L. No. 111-203, § 745(b), 124 Stat. 1376, 1735-36.  With respect to event contracts specifically, the CFTC may prohibit event contracts in specific categories if it determines them to be "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2).  If an exchange self-certifies a new contract, the CFTC may initiate a review of that contract within 10 business days of receiving notice of it.  *See* 7 U.S.C. § 7a-2(c)(2); *see also* 17 C.F.R. § 40.11(c) (permitting the CFTC to select a 90-day review period for event contracts).  If the CFTC does not act within that window, the new contract is deemed approved and becomes effective.  *See* 7 U.S.C. § 7a-2(c)(2).

Kalshi self-certified and began listing sports-related event contracts on January 24, 2025.  *KalshiEx*, 2025 WL 1073495, at *4.  Because the CFTC declined to review or prohibit Kalshi's sports-related event contracts, *id.*, they were deemed approved and became effective upon the expiration of the 10-day probationary period under 7 U.S.C. § 7a-2(c)(2) and are legal under federal law.

Fundamental differences in how contract markets and sportsbooks operate mean they are susceptible to different forms of risk to participants.  Contract markets leverage the power and rigor of financial markets to provide traders with liquidity and transparency, and prices are set by market participants.  Customers can manage risk by adjusting or exiting their positions up until the contract expires, and prices respond accordingly.  These markets may be at risk of market manipulation and other market distortions and inefficiencies.  Sportsbooks, by comparison, have

a line set by the house, which is typically set ahead of time and, once a bet is placed, does not

change for that bet.  Gamblers bet directly against the house, and once a position is entered,

gamblers typically do not have the option to exit their position.  Sportsbooks risk exploitation of

gamblers due to the power imbalance between the house and the gambler.  Based on these

different risks, it makes sense that contract markets and sportsbooks are subject to two different

modes of regulation.  The federal regulations that govern commodity futures and swaps trading

have as a major focus creating and maintaining fair and efficient markets for trading, *see*

17 C.F.R. §§ 38.250, 38.151, whereas sportsbooks are regulated by state law and subject to the

police powers of the state to halt and remedy any exploitation of gamblers.

### B.    Futures Commission Merchant Regulation by the CEA and CFTC.

Robinhood is registered with the CFTC as a futures commission merchant ("FCM").

Declaration of James B. Mackenzie in Support of Plaintiff Robinhood's Motion for a Temporary

Restraining Order and Preliminary Injunction ("Mackenzie Decl.") ¶ 3.  As relevant here, an

FCM is "an individual, association, partnership, corporation, or trust that is engaged in soliciting

or in accepting orders for the purchase or sale of a commodity for future delivery; a security

futures product; a swap" or certain other transactions and "in or in connection with [those

activities], accepts any money, securities, or property (or extends credit in lieu thereof) to

margin, guarantee, or secure any trades or contracts that result or may result therefrom."

7 U.S.C. § 1a(28) (subsection headings omitted).  FCMs must register with the CFTC unless they

fall within certain exemptions.  *Id.* § 6f; 17 C.F.R. § 3.10(c).

Similar to a registered DCM (such as Kalshi), registered FCMs such as Robinhood must

comply with a host of federal requirements.  FCMs are subject to reporting requirements to the

CFTC, 17 C.F.R. §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id.* § 1.55, and

minimum financial requirements, *id.* §§ 1.12, 1.17.  FCMs must "establish, maintain, and enforce

a system of risk management policies and procedures designed to monitor and manage the risks

associated with the activities of the" FCM, *id.* § 1.11(c)(1), and the CFTC's regulations set forth

elements that such a risk management program must include, *id.* § 1.11(e), as well as reporting

requirements related to risk management, *see id.* § 1.15.  The CFTC requires FCMs to "establish and enforce internal rules, procedures and controls to" ensure compliance with certain trading standards.  *Id.* § 155.3.  FCMs must also "adopt and implement written policies and procedures" to ensure that they and their employees comply with CFTC regulations concerning conflicts of interest.  *Id.* § 1.71.  Finally, the CFTC imposes recordkeeping requirements on FCMs.  *Id.* §§ 1.14, 1.18.  Failure to comply with these requirements could require the FCM to "transfer all customer accounts and immediately cease doing business as a futures commission merchant." *Id.* § 1.17(a)(4).

### C.    Robinhood, Event Contracts and Kalshi.

The companies within the Robinhood organization are financial-services companies that are democratizing finance by removing barriers to access to financial markets, including by offering zero-commission stock trading and easy-to-use mobile and web applications. Mackenzie Decl. ¶ 2.  With their commitment to offering low fees, an intuitive mobile experience and powerful tools, the Robinhood companies empower everyday investors to navigate financial markets safely and efficiently.  *Id.*

On March 17, 2025, Robinhood launched its prediction markets hub, through which its customers can place event contract trade orders.[1]  *Id.* ¶ 4.  Robinhood intermediates its customers' event contract trades, including sports-related event contract trades, on Kalshi's exchange.  *Id.* ¶ 5.  Robinhood has entered into agreements with Kalshi that allow it to access Kalshi's contract market facilities for this purpose.  *Id.* ¶ 6.  Those agreements obligate Robinhood to ensure such access is secure and in compliance with all applicable laws, including the CEA and CFTC regulations; they also require Robinhood to comply with Kalshi's rules.  *Id.*

---

[1] Robinhood began offering some limited event contract trading starting in October 2024, prior to the launch of the prediction markets hub.  Mackenzie Decl. ¶ 4.  The only event contracts Robinhood offered in 2024 were related to the outcome of the U.S. presidential election; those contracts were not traded on Kalshi's exchange.  *Id.*

This means that while Robinhood customers are placing orders for event contract trades in their Robinhood accounts, the *trades* themselves are taking place on Kalshi's CFTC-designated exchange. *Id.* ¶ 5. This is no different from when a Kalshi customer places an order for an event contract trade through her Kalshi account, which is then executed on Kalshi's exchange. Here, the user interface is Robinhood's instead of Kalshi's, which is convenient for Robinhood customers but does not affect the way in which trades are executed on Kalshi's exchange or regulated by the CFTC; it merely adds additional CFTC regulation of Robinhood's activities as an FCM. *Id.*

**D.    The Letters from the Board.**

On March 4, 2025, the Board sent Kalshi a cease-and-desist letter threatening to bring a legal action to prohibit Kalshi from any trading of sports-related event contracts in Nevada. *KalshiEx*, No. 2:25-CV-00575, ECF No. 1-2, at 1-2. The Board asserted that Kalshi was "operating as an unlicensed sports pool" in violation of Nev. Rev. Stat. §§ 463.160(1)(a) and 473.245(2). *Id.* It further asserted that Kalshi was violating Nev. Rev. Stat. § 465.086 (prohibiting receipt of compensation for accepting bets or wagers upon the result of certain events without required licenses) and Nev. Rev. Stat. § 465.092 (prohibiting receipt of a wager from another person who is physically present within Nevada). *Id.* The Board demanded that Kalshi "immediately cease and desist from offering any event-based contracts in Nevada." *Id.* The Board reserved "all rights to pursue criminal and civil actions" if Kalshi failed to comply with the cease-and-desist letter. *Id.* at 2.

Upon receiving the cease-and-desist letter, Kalshi, arguing that Nevada law is preempted by the CEA, sought declaratory and injunctive relief from this Court. *KalshiEx*, No. 2:25-CV-00575, ECF No. 1. The Court granted Kalshi's motion for a preliminary injunction, holding that Kalshi demonstrated a likelihood of success on the merits, that it will likely suffer irreparable harm without relief, and that the balance of interests favors injunction. *KalshiEx*, 2025 WL 1073495, at *2-8.

Robinhood maintains that offering sports-related event contract trading to its customers in Nevada would not violate any state laws.  But in light of the cease-and-desist letter that Kalshi received, as of March 14, 2025, Robinhood chose not to allow Nevada residents to enter positions for sports-related event contracts by implementing a "position closing only" restriction on existing and new Robinhood accounts with a current Nevada address while Kalshi's lawsuit proceeded in this Court.  Mackenzie Decl. ¶ 8.

On May 6, 2025, after this Court's decision in *KalshiEx*, 2025 WL 1073495, Robinhood met with the Board and explained that it believed it should be able to offer sports-related event contracts trading through Kalshi's exchange for as long as this Court's order in *KalshiEx* remains in effect.   Declaration of Kevin J. Orsini in Support of Plaintiff Robinhood's Motion for a Temporary Restraining Order and Preliminary Injunction ("Orsini Decl.") ¶ 3.  At the conclusion of that meeting, Board employees indicated they did not expect to be able to agree to refrain from enforcement action against Robinhood, even while the *KalshiEx* order is in place.  *Id.*  They stated that they would contact Robinhood if they ultimately reached a different conclusion, and to date, they have not done so.

On May 8, 2025, the Board sent Robinhood a letter stating that it would consider Robinhood's allowing Nevada customers to trade sports-related event contracts to be a violation of Nevada law.  Mackenzie Decl. ¶ 9.  The Board asserted that if Robinhood were to allow such trading, it would be in violation of the same Nevada laws as those it asserted Kalshi violated as well as Nev. Rev. Stat. § 463.350 (prohibiting persons under the age of 21 from being allowed to place wagers at sports pools).  *Id.*  The Board further stated that it would deem a decision by Robinhood to allow such trading to be "willful violations" of Nevada law, and it reserved the Board's right to "pursue criminal and civil actions" should Robinhood allow its Nevada customers to trade sports-related event contracts.  *Id.*  Violations of the Nevada state gaming statutes cited in the Board's letter are punishable as a "category B felony," carrying a prison sentence of between one to ten years or a fine of up to $50,000.  Nev. Rev. Stat. § 463.360(3).

On May 19, 2025, Robinhood met with the Board again and sought an agreement from the State of Nevada to permit Robinhood at least temporarily to offer its customers the same sports-related event contracts that are traded on Kalshi's exchange.  Orsini Decl. ¶ 4.  The Board declined Robinhood's proposal.  *Id.*

## ARGUMENT

"To qualify for a preliminary injunction, a party must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the movant, and (4) an injunction is in the public interest."  *KalshiEx*, 2025 WL 1073495, at *2 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The third and fourth factors "merge when the Government is the opposing party."  *Doe v. Horne*, 115 F.4th 1083, 1098 (9th Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  The movant must make the same showing to obtain a temporary restraining order.  *See LIT Ventures, LLC v. Carranza*, 457 F. Supp. 3d 906, 908 (D. Nev. 2020) (quoting *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)) ("The legal standard for issuing a temporary restraining order is 'substantially identical' to the standard for issuing a preliminary injunction.").

## I.    ROBINHOOD IS LIKELY TO SUCCEED ON THE MERITS.

This Court has already held that Kalshi is likely to succeed in establishing that the CFTC's exclusive jurisdiction over sports-related event contracts traded on Kalshi's designated contract market preempts Nevada gaming laws.  *KalshiEx*, 2025 WL 1073495, at *3-8.[2]  The

---

[2] The Court was in good company when it did so; numerous other courts have found that the CEA's grant of exclusive jurisdiction to the CFTC is broad and preempts other regulatory schemes, including both state and other federal statutes.  *See, e.g.*, *Hunter v. Fed. Energy Reg. Comm'n*, 711 F.3d 155, 158-59 (D.C. Cir. 2013) (Federal Energy Regulatory Commission lacked jurisdiction in light of CFTC's exclusive jurisdiction); *KalshiEx, LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 WL 1218313, at *4-6 (D.N.J. Apr. 28, 2025) (hereinafter "*KalshiEx (D.N.J.)*") (preemption by CEA and CFTC regulations of New Jersey gambling laws), *appeal filed*, No. 25-1922 (3d Cir. May 8, 2025); *Witzel v. Chartered Sys. Corp. of N.Y., Ltd.*, 490 F. Supp. 343, 347-48 (D. Minn. 1980) (preemption by CEA and CFTC regulations of Minnesota Securities Act); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) (claims arising under federal and state securities statutes barred in light of CFTC's exclusive

same event contract products are at issue here as were at issue in *KalshiEx*, and the same result

should follow:  transactions involving sports-related event contracts traded on Kalshi's

designated contract market—regardless of whether the trade orders come directly to Kalshi from

Kalshi's customers or indirectly to Kalshi from Robinhood's customers—are subject to the

CFTC's exclusive jurisdiction, and Nevada law is preempted to the extent it purports to regulate

those transactions.

A.    **The CEA Preempts Application of State Gaming Laws to Sports-Related Event Contract Trading on CFTC-Designated Exchanges.**

The Constitution and laws of the United States "shall be the supreme Law of the Land,"

U.S. Const. art. VI, cl. 2, and accordingly, "Congress has the power to preempt state law."

*Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Federal law can preempt state

law expressly, through a statement to that effect in the statute itself, or impliedly, through either

field preemption or conflict preemption.  Field preemption exists where Congress manifests an

intent to occupy exclusively an entire field of regulation.  *See Fidelity Fed. Sav. & Loan Ass'n v.

De la Cuesta*, 458 U.S. 141, 153 (1982).  Conflict preemption exists where compliance with

federal and state law is "a physical impossibility" or when "state law stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (internal

quotation omitted).   Here, as the Court already found, the statutory language of the CEA, its

legislative history and the comprehensive regulatory framework it sets out demonstrate that

Congress deliberately preempted state law.  Whether analyzed as express or implied preemption,

---

jurisdiction); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979)
(recognizing that "[i]t is now established . . . that the SEC and other federal agencies are
'stripped' of authority to regulate commodities transactions and that state regulatory agencies are
likewise preempted by the 'exclusive jurisdiction' of the CFTC" (internal citations omitted));
*Bartels v. Int'l Commodities Corp.*, 435 F. Supp. 865, 869 (D. Conn. 1977) (with "its own
sphere," the CFTC displaced the Securities and Exchange Commission's previous authority over
commodity options trading).

the scope of preemption is the field of commodity futures and swaps trading, including event contract trading, on CFTC-designated exchanges.

*First*, the CEA provides expressly that the CFTC "shall have exclusive jurisdiction" over commodity futures and swaps trading on CFTC-designated exchanges. 7 U.S.C. § 2(a)(1)(A). Express provisions of this type are regularly held to preempt state law. *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765-66 (9th Cir. 2018) (describing statute's grant of "exclusive" jurisdiction as a "broad and general" preemption provision); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001) (holding that statute's "exclusive jurisdiction" provision preempts state law claims).

This express preemption provision includes event contracts, which are "transactions involving swaps or contracts of sale of a commodity for future delivery," over which the CFTC has "exclusive jurisdiction" when "traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). The term "swap" includes "any agreement, contract, or transaction" that (among other things) "provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). The term "swap" was added to the CEA in 2010 by the Dodd-Frank Act. *See* Pub. L. No. 111-203, §§ 721(a)(21) (adding the definition of "swap" in 7 U.S.C. § 1a(47)), 722(a)(1)(D) (adding "swaps" to the exclusive jurisdiction provision in 7 U.S.C. § 2(a)(1)(A)), 124 Stat. 1376, 1666, 1672.

Alternatively, or in addition to being swaps, event contracts may be considered transactions in a type of intangible commodity that the CEA calls an "excluded commodity." *See United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021) (reviewing "excluded commodities" under the CEA). An "excluded commodity" includes "an occurrence, extent of an occurrence, or contingency (other than [certain exceptions]) that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

This is precisely what the event contracts traded on Kalshi's exchange are.  Sports-related event contracts are within these statutory definitions of swaps and transactions in excluded commodities because:  (i) they are binary contracts that pay out depending on the occurrence or non-occurrence of a future event that is beyond the control of the parties to the contract; and (ii) the underlying sporting events they concern have economic consequence.  *See KalshiEx*, 2025 WL 1073495, at *5 n.3; *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *2, *6.  With respect to the latter requirement, wins and losses in sporting events have obvious, significant financial consequences for the players, the teams, the owners or the schools they represent, their communities, the television networks that cover the matches, and other stakeholders.  *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *6 ("Defendants argue that sporting events are without potential financial, economic, or commercial consequence. On the record before me, I disagree.").  For example, wins can increase the value of the franchise, leading to more ticket sales, more revenue from sponsorships, merchandise, parking, and food at games, and more TV viewership, as the Florida Panthers experienced after winning the 2024 Stanley Cup.  Orsini Decl. ¶ 5.  Sporting events also generate economic boons for the cities in which they take place; the New York Knicks' 2025 postseason generated an estimated $195 million in economic activity from home playoff games.  *Id.* ¶ 6.  Sporting events also impact the advertising revenue to television networks that broadcast them; when this year's NBA Finals went the full seven games, ABC's sports viewership increased 17% during the month the games took place compared to the previous month.  *Id.* ¶ 7.

The CEA expressly grants the CFTC "exclusive jurisdiction" over all "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A).  The CEA also includes a separate provision entitled "Special rule for review and approval of event contracts and swaps contracts," which confirms that the CFTC has authority over "the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than [certain exemptions]), by a

designated contract market or swap execution facility." *Id.* § 7a-2(c)(5)(C)(i).  The "special

rule," added by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, § 745(b), 124 Stat.

at 1735-36, makes clear that the CEA's grant of exclusive jurisdiction to the CFTC extends to

event contracts.

This Court's ruling in *KalshiEx* that the CEA expressly preempts state gaming laws as

applied to trading of sport-related event contracts on Kalshi's DCM was correct and consistent

with authority.  No. 2:25-cv-00575, 2025 WL 1073495, at *3-7; *see also KalshiEx (D. N.J.)*,

2025 WL 1218313, at *5.[3]

*Second*, to the extent the text of the statute leaves any doubt about preemption, the

legislative history of the 1974 amendment to the CEA that established the CFTC confirms that

this grant of exclusive jurisdiction was intended to establish broad field preemption.  As the

Conference Committee explained, "[u]nder the exclusive grant of jurisdiction to the

Commission, the authority in the Commodity Exchange Act (and the regulations issued by the

---

[3] One district court reached the opposite conclusion about Kalshi's event contracts in deciding a motion for a preliminary injunction.  *KalshiEx LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908, at *1 (D. Md. Aug. 1, 2025), *appeal filed*, No. 25-1892 (4th Cir. Aug. 1, 2025).  But that decision is inconsistent with the weight of authority on this question, and its reasoning is unpersuasive for a number of reasons.  Foremost, the decision does not address whether the CEA expressly preempts state law.  *Id.* at *5-13 (stating that "Kalshi does not contend that the CEA expressly preempts state law" and analyzing only implied field and conflict preemption).  As a result, the court wrongly applies a presumption against preemption, *id.* at *5-6, which has no place where "the statute contains an express pre-emption clause," *Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016). Among other defects with the Maryland district court's reasoning, the court assumes, wrongly and without analysis, that sports-related event contract trading is gambling, and that assumption colors the entire opinion.  *See, e.g.*, *Martin*, 2025 WL 2194908, at *6 ("Kalshi's burden with respect to its field preemption claim is to establish that Congress clearly and manifestly intended to strip states of their authority to regulate gambling if the company offering such wagering opportunities has been approved to sponsor a designated contracts market for commodities trading.").  The court also does not consider the conflict between application of state gaming laws and the Special Rule in 7 U.S.C. § 7a-2(c), namely Congress's decision in enacting the Special Rule that the CFTC would be the decisionmaker, not the Board.  *See id.* at *11-13 (failing to analyze this conflict in the discussion of conflict preemption).  This Court therefore should disregard the *Martin* decision as lacking persuasive power.

Commission) would preempt the field insofar as futures regulation is concerned.  Therefore, if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern.  In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the States."  H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897; *see also Hofmayer*, 459 F. Supp. at 737 (finding field preemption from the CEA and dismissing claims brought under preempted federal and state statutes).  As the D.C. Circuit has recognized, "the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*.'"  *Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (quoting S. Rep. No. 93-1131, at 23 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5863) (emphasis in original).  "The passage of 7 U.S.C. § 2 is intended to clarify 'the preemption of all other would-be regulators at every level of government.'"  *Witzel*, 490 F. Supp. at 347 (quoting *Jones*, 466 F. Supp. at 219).  Likewise, the history surrounding the adoption of the "special rule" concerning event contracts in 2010 makes it clear that Congress intended the CFTC's exclusive jurisdiction to embrace event contracts.  *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sens. Lincoln and Feinstein).

Congressional statements about the creation of the CFTC confirm the intent for broad express or implied field preemption.  The 1974 amendments to the CEA were motivated by concerns that states "might step in to regulate the futures markets themselves" and create "conflicting regulatory demands."  *KalshiEx*, 2025 WL 1073495, at *6 (quoting *Am. Agric. Movement, Inc.*, 977 F.2d at 1155-56); *see also Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 1105, 1112 (N.D. Ga. 1985) ("The congressional hearings focused on the need for sole regulatory power of commodities to be placed in one federal agency, unlike the regulation of securities which is shared by a federal agency and state agencies.").  Establishing the CFTC and endowing it with exclusive jurisdiction was meant to "avoid unnecessary, overlapping and duplicative regulation."  *Ken Roberts Co.*, 276 F.3d at 588 (quoting 120 Cong.

Rec. 34,736 (1974) (remarks of House Agriculture Committee Chairman Poage)); *see also* 120 Cong. Rec. 34,997 (1974) (remarks of Sen. Curtis on behalf of Sen. Talmadge); Senate Hearings at 685 (statement of Sen. Clark) ("[D]ifferent State laws would just lead to total chaos."). Accordingly, the CFTC was empowered to set forth uniform rules and regulations for "all exchanges and all persons in the industry." H.R. Rep. No. 93-975, at 79 (1974).[4] Congressional statements concerning the event contract "special rule," including by the drafters of the Dodd-Frank Act of 2010, are consistent with these earlier statements and reveal clear Congressional intent to vest exclusive jurisdiction over event contracts with the CFTC. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Lincoln conveying her intent and that of Sen. Dodd); *see also KalshiEx LLC v. Flaherty*, No. 25-1922, ECF No. 66 (Brief of Amici Curiae Seven Former Members of Congress in Support of Plaintiff-Appellee) 15-23 (3d Cir. July 31, 2025).

*Third*, the regulatory scheme set out in the CEA, over which the CFTC has exclusive jurisdiction, is comprehensive as it relates to designated and registered entities, and the existence of this comprehensive scheme further evinces Congressional intent to preempt the field and foreclose parallel state regulation. *See Arizona v. United States*, 567 U.S. 387, 401 (2012) (comprehensive statutory framework led to the conclusion that "the Federal Government has occupied the field" in the relevant area); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986) ("Pre-emption occurs . . . where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law . . . .").

---

[4] As further indication of Congressional intent that the CEA preempt broadly, during the amendment process for the 1974 amendments, the Senate considered adding but did not include a provision that retained the states' jurisdiction over futures trading. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687-88 (1982); *see also* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). Congress therefore could not have intended States to regulate futures trading in parallel with the CFTC. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

1    Indeed, the Supreme Court has recognized that the CEA establishes "a comprehensive regulatory

2    structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce,*

3    *Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1

4    (1974)).

5          Accordingly, the CEA, as amended in 1974 to give the CFTC exclusive jurisdiction and

6    in 2010 to add swaps and the special rule regarding event contracts, expressly or impliedly

7    preempts the field of commodity futures and swaps trading, including event contracts trading, on

8    designated contract markets.

9          In addition to express or implied field preemption, conflict preemption exists here with

10   respect to the determination of *which* event contracts are permitted on CFTC-designated

11   exchanges.  As noted above, the special rule relating to CFTC review of event contracts vests the

12   CFTC with the power to approve or prohibit certain event contracts.  7 U.S.C. § 7a-2(c)(5)(C)(i);

13   17 C.F.R. § 40.11(a)(1)-(2).  If the Board were permitted *also* to make a determination about

14   whether event contracts on a CFTC-regulated exchange were permitted, there would be a direct

15   conflict between federal and state regulation because the CFTC has already impliedly approved

16   these same event contracts.  *See Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 380

17   (2000) (conflict preemption exists where state law "undermines the congressional calibration of

18   force" and is "at odds with achievement of the federal decision about the right degree of pressure

19   to employ"); *De la Cuesta*, 458 U.S. at 153 (conflict preemption exists where "state law stands

20   as an obstacle to the accomplishment and execution of the full purposes and objectives of

21   Congress" and where "compliance with both federal and state regulations is a physical

22   impossibility" (internal quotation marks omitted)).  Here, the CFTC has determined to allow

23   Kalshi's sports-related event contracts by taking no action in response to Kalshi's self-

24   certification of those contracts, making them legal under federal law, but the Board has

25   threatened to preclude trading of those same event contracts by enforcing Nevada gaming laws.

26   The conflict is clear.

27

28

**B.    The CEA's Preemption of State Gaming Laws as Applied to Sports-Related Event Contracts Includes Those Opened and Traded Through Robinhood's Platform.**

Given the broad, express preemptive language and clear Congressional intent, the Court's prior holding that the CEA likely preempts the state gaming laws that the Board threatened to enforce against Kalshi in connection with sports-related event contracts was well founded.  The same result is compelled regardless of whether those event contract positions are opened and traded through Kalshi's interface (as was the case in *KalshiEx*, 2025 WL 1073495) or through Robinhood's (as is the case here).

*First*, Kalshi and Robinhood participate in transactions involving "swaps or contracts of sale of a commodity for future delivery" traded on a DCM, and these transactions therefore fall squarely within the statutory grant of exclusive jurisdiction to the CFTC.  *See* 7 U.S.C. § 2(a)(1)(A) (granting CFTC "exclusive jurisdiction" over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC).  Because it is the *transaction* on a regulated exchange over which the CFTC has exclusive jurisdiction, *see id.*, the CFTC must have jurisdiction over the *entire* transaction and all participants.  This includes entities like Robinhood that accept orders or otherwise facilitate transactions, as well as entities like Kalshi that execute transactions.  *See id.* § 1a(28)(A) (CEA expressly envisions FCMs facilitating transactions in swaps and commodities for future delivery).

If states could regulate some but not all entities relevant to these transactions, such regulation would infringe on the CFTC's exclusive jurisdiction and fracture what Congress intended to be a uniform set of regulations for commodity futures and swaps trading.  A state cannot circumvent the exclusive jurisdiction of the CFTC by enforcing state law against an entity involved in facilitating a transaction when the state has been enjoined from enforcing state law against the entity involved in executing that same transaction.  Indeed, as the CFTC itself recently explained to the D.C. Circuit, "due to federal preemption, event contracts *never violate*

*state law when they are traded on a [designated contract market].*"  CFTC Brief, *KalshiEx LLC v. U.S. Commodity Futures Trading Comm'n*, No. 24-5205, at 27, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

*Second,* the conclusion that preemption applies equally to Robinhood's facilitation of these transactions as an FCM is further supported by the fact that Congress explicitly included FCMs such as Robinhood within the extensive set of federal regulatory requirements and CFTC oversight established to manage commodity derivatives trading.  The "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Curran*, 456 U.S. at 356 (internal quotation marks omitted), established by Congress includes FCMs that facilitate purchases and sales of commodities for future delivery and swaps; indeed, this is in part what defines an FCM, 7 U.S.C. § 1a(28)(A)(i)(I)(aa)(AA), (CC).  As noted above, FCMs such as Robinhood that are registered with the CFTC must comply with a multitude of requirements, including minimum financial requirements, 17 C.F.R. §§ 1.12, 1.17, reporting requirements, *id.* §§ 1.10(b), 1.10(d), 17.00, and disclosure requirements, *id.* § 1.55.  They must also establish and enforce policies relating to trading standards, risk management, and conflicts of interest.  *Id.* §§ 1.15, 1.71, 155.3.  State regulation of orders on an FCM (when those orders will be executed on a DCM) would conflict with federal authorization of transactions through FCMs subject to CFTC jurisdiction.  *See* 7 U.S.C. § 1a(28)(A) (CEA expressly envisions FCMs facilitating transactions in swaps and commodities for future delivery).

In short, the "oversight of futures commission merchants ('FCMs')" is an "important aspect" of the CFTC's oversight responsibility for futures trading.  *Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 650 (7th Cir. 2013).  FCMs like Robinhood are therefore an integral part of the fabric of the CEA's comprehensive regulatory scheme, and their activities in facilitating trading on DCMs are equally subject to federal preemption as those of DCMs like Kalshi.

**II.    ROBINHOOD WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE RELIEF.**

A plaintiff must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm." *KalshiEx*, 2025 WL 1073495, at *7; *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."). Loss of business and goodwill can also inflict irreparable injury. *Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841; *see also Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (loss of goodwill "cannot readily be remedied with damages"). These factors are each just as applicable to Robinhood as they were to Kalshi.

Robinhood is suffering irreparable harm as a result of the Board's refusal to acknowledge that the Court's *KalshiEx* Order is equally applicable to Robinhood's facilitation of sports-related event contracts offered through the Kalshi exchange. Because Robinhood has granted access to sports-related event contract trading for its Nevada customers, Mackenzie Decl. ¶ 12, and its Nevada customers have opened positions in sports-related event contracts, *id.* ¶ 13, Robinhood faces the imminent threat of potential civil liability and criminal prosecution. The sanctions for violation of Nev. Rev. Stat. § 463.160 include civil and criminal penalties, including a fine "of not more than $50,000" and "imprisonment . . . for a minimum term of not less than 1 year and a maximum term of not more than 10 years." Nev. Rev. Stat. § 463.360(3). The threat of prosecution, articulated in the Board's letter, is actual and imminent. Mackenzie Decl. ¶ 14. A credible threat of prosecution under a preempted state statute causes irreparable harm. *See Morales*, 504 U.S. at 381.

Further, the harm to Robinhood's reputation caused by the threat, the uncertainty surrounding the status of sports-related event contract trading in Nevada, and potential enforcement proceedings by the Board is also irreparable, because it cannot be easily or quickly repaired. *KalshiEx*, 2025 WL 1073495, at *7-8; *see also Life Alert Emergency Response, Inc. v.*

*LifeWatch, Inc.*, 601 F. App'x 469, 474 (9th Cir. 2015).  Robinhood also stands to lose the goodwill of its customers, including its over 12,000 customers in Nevada.  Mackenzie Decl. ¶ 18.  This goodwill, once lost, cannot easily or quickly be regained, even if Robinhood ultimately prevails in litigation, and the risk to goodwill therefore also constitutes irreparable harm.  *KalshiEx*, 2025 WL 1073495, at *7; *see also Life Alert*, 601 F. App'x at 474 (citing *Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841) (holding that company was entitled to preliminary injunction due to "the threat to [its] reputation and goodwill," which "is not readily compensable").

Nor could Robinhood have avoided irreparable harm by continuing voluntarily to comply with the Board's cease-and-desist demand to Kalshi and letter to Robinhood.  Had it continued to comply, Robinhood would have been forced to continue to forgo significant business in Nevada, resulting in loss of revenue.  Mackenzie Decl. ¶¶ 17-18.  These economic losses would be unrecoverable because sovereign immunity bars Robinhood from obtaining monetary damages for the Board's impact on Robinhood's business.  *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999).  Damages that are unrecoverable due to sovereign immunity constitute irreparable harm. *See, e.g.*, *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (plaintiff state would suffer irreparable harm without a preliminary injunction because "the [defendant] Tribe's sovereign immunity likely would bar the State from recovering monetary damages"); *Grondal v. United States*, No. 2:09-CV-18-RMP, 2020 WL 13388646, at *5 (E.D. Wash. Aug. 20, 2020) ("[F]inancial harm can constitute irreparable injury in the context of preliminary injunctions when the money lost cannot be recovered later due to sovereign immunity.").  Continuing to prevent Nevada residents from opening sports-related event contract positions would also undermine customers' confidence in Robinhood and their reliance on its financial services, Mackenzie Decl. ¶ 19, causing irreparable harm.  *KalshiEx*, 2025 WL 1073495, at *7; *see also Life Alert*, 601 F. App'x at 474.  Given the Board's demand that Robinhood comply with preempted state law, Robinhood had and has no way to avoid irreparable harm in the absence of a temporary restraining order and preliminary injunction.

**III.    THE EQUITIES AND PUBLIC INTEREST TILT STRONGLY IN ROBINHOOD'S FAVOR.**

The balance of harms strongly favors Robinhood, just as it did for Kalshi.  If the Court does not grant the requested temporary restraining order and preliminary injunction, the harm to Robinhood will be significant.  By contrast, the Board and the public would suffer little to no harm if the requested relief is granted.

The interests favor injunction because Robinhood can demonstrate that Nevada law is likely preempted as to the transactions at issue involving sports-related event contract trades through Kalshi's CFTC-designated market, just as Kalshi did.  *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (quoting *United States v. Arizona*, 641 F.3d 339, 365 (9th Cir. 2011)) ("[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available.").  The state of Nevada, and the public generally, can have no interest in enforcing preempted state law against Robinhood.  *Id*.  "The balance of hardships tips in [movant's] favor given that [plaintiff] is facing substantial monetary expenditures, reputational damages, or civil and criminal prosecution based on the defendants' demands that the defendants likely cannot make because they are preempted."  *KalshiEx*, 2025 WL 1073495, at *7.  The equities here strongly favor the issuance of an injunction.

**IV.    NO SECURITY—OR ONLY *DE MINIMIS* SECURITY—IS APPROPRIATE.**

A party seeking a temporary restraining order or preliminary injunction must "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The amount of the bond is left to the discretion of the Court.  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).

Here, no security is needed because Defendants will not suffer any non-speculative harm by delaying enforcement.  *See Jorgensen*, 320 F.3d at 919 (affirming decision not to require bond).  Recognizing, however, that this Court held that a *de minimis* bond was appropriate for

Kalshi, *KalshiEx*, 2025 WL 1073495, at *8, such security for Robinhood should also be *de minimis* and no greater than $10,000—the amount of the bond Kalshi was ordered to post, *id.*

### CONCLUSION

For the reasons set forth above, the Court should grant Robinhood's motion for a temporary restraining order and preliminary injunction.

DATED this 19th day of August, 2025.

PISANELLI BICE PLLC

By: ___*/s/ Jordan T. Smith*___
          Jordan T. Smith, Esq., #12097
          400 South 7th Street, Suite 300
          Las Vegas, Nevada  89101

          Kevin J. Orsini, Esq.
          (*pro hac vice pending*)
          Antony L. Ryan, Esq.
          (*pro hac vice pending*)
          Brittany L. Sukiennik, Esq.
          (*pro hac vice pending*)
          CRAVATH, SWAINE & MOORE LLP
          375 Ninth Avenue
          New York, New York  10001

          *Counsel for Plaintiff*
          *Robinhood Derivatives, LLC*