AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General - Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3768 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov

*Attorneys for Mike Dreitzer, George Assad, Chandeni K. Sendall, Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, Nevada Gaming Commission and Aaron D. Ford*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ROBINHOOD DERIVATIVES, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>MIKE DREITZER, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD, a subdivision of the State of Nevada; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; BRIAN KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission; GEORGE MARKANTONIS, in his official capacity as a Member of the Nevada Gaming Commission; NEVADA GAMING COMMISSION, a subdivision of the State of Nevada; AARON D. FORD, in his official capacity as Attorney General of Nevada,<br><br>Defendants. | Case No. 2:25-cv-01541-APG-DJA<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF ROBINHOOD'S MOTION FOR A TEMPORARY RETRAINING ORDER AND PRELIMINARY INJUNCTION** |

**DEFENDANTS' RESPONSE TO PLAINTIFF ROBINHOOD'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendants MIKE DREITZER, GEORGE ASSAD, CHANDENI K. SENDALL, NEVADA GAMING CONTROL BOARD, JENNIFER TOGLIATTI, ROSA SOLIS-RAINEY, BRIAN KROLICKI, GEORGE MARKANTONIS, NEVADA GAMING COMMISSION and AARON D. FORD, by and through counsel, Jessica E. Whelan, Chief Deputy Solicitor General – Litigation, and Sabrena K. Clinton, Senior Deputy Attorney General, of the State of Nevada, Office of the Attorney General, hereby submit this Response to Plaintiff Robinhood Derivative LLC's ("Robinhood") Motion for a Temporary Restraining Order and Preliminary Injunction. This Motion is based on the following memorandum of points and authorities, the pleadings and papers herein and any oral argument this Court may allow.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The State of Nevada has regulated gaming within its borders for more than 150 years with minimal to no involvement by the federal government. Now, a series of lawsuits has surged forth, claiming that two words enacted into law almost one hundred years ago completely preempt state gaming law with respect to wagers disguised as contracts traded on a federal exchange. If ever there was a case to apply the strong presumption against preemption in an area of traditional state regulation, this is it. Robinhood must overcome this strong presumption to show a likelihood of success on the merits, irreparable harm, and the favorable balance of equities. It cannot do so.

The import of Robinhood's Motion for Preliminary Injunction is that, because this Court granted a preliminary injunction to KalshiEX LLC ("Kalshi"), the designated contract market, or DCM, on which Robinhood's contracts trade, the Court should grant Robinhood the same relief. However, as the Court made clear at the May 15, 2025 status check in the *Kalshi* case,[1] that injunction was specific to Kalshi and did not extend to any other parties. Thus, Robinhood cannot simply rely on the fact that *Kalshi* was granted a preliminary injunction and must instead meet its burden to show independent entitlement to a preliminary injunction.

---

[1] *KalshiEX LLC v. Hendrick*, 2:25-cv-00575-APG-BNW.

By now, this Court is familiar with the issues presented by this Motion. As noted, the Court granted a preliminary injunction in the *Kalshi* case on an expedited briefing schedule without full factual and legal development. *Kalshi v. Hendrick*, 2025 WL 1073495. Since that decision, much has happened, both in Nevada and in other jurisdictions. This Court has pending before it a similar motion for preliminary injunction in *North American Derivatives Exchange, Inc. v. Hendrick*, 2:25-cv-00978-APG-BNW (hereinafter, "*Crypto.com*"). The Court likewise has benefited from additional substantive briefing in the *Crypto.com* case on a motion for judgment on the pleadings. Moreover, two other federal district courts have recently considered similar preliminary injunction motions: *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) (granting motion for preliminary injunction); and *KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908 (D. Md. Aug. 1, 2025) (denying motion for preliminary injunction), both of which are currently on appeal.

What should be clear from these additional developments is that the state of the law—and therefore Robinhood's likelihood of success—is anything but settled. A more fulsome analysis of the legal landscape than this Court had before it ruled in *Kalshi v. Hendrick* shows that Robinhood is not likely to succeed on the merits of their claim that the Commodity Exchange Act preempts state gaming law. And, because Robinhood cannot show a likelihood of success, its arguments with respect to irreparable harm and balance of equities likewise fail.

## STATEMENT OF FACTS

### I. History of Gaming in Nevada

Gaming in Nevada has a long and storied history, dating back to before the state's inception. Prospectors traveling to the Sierra Nevada to search for gold in the mid-nineteenth century brought games of chance with them to the area. "History of Gaming in Nevada," Nevada Resort Association, https://perma.cc/9VX4-F8NG (last accessed September 22, 2025). In 1861, however, under the leadership of Nevada Territory Governor James Nye, the territorial legislature instituted stiff penalties for running and participating in any game of chance. *Id.* However, the measure was not very successful, and when Nevada attained statehood in 1864, penalties were drastically reduced; operators were punished only mildly, and players were not punished at all. *Id.*

In 1869, the Legislature succeeded in decriminalizing certain forms of gambling. *Id.* After a brief ban on gambling during the Progressive Movement of the early twentieth century, Nevada eventually legalized "wide-open" gambling in 1931, a move that soon gave rise to Nevada's booming casino industry. *Id.*; Robert D. Faiss & Gregory R. Gemignani, Nevada Gaming Statutes: The Evolution and History, University of Nevada: The Center for Gaming Research, at 1 (2011), http://digitalscholarship.unlv.edu/occ_papers/11 (last accessed September 22, 2025). About a decade later, the Legislature shifted licensing from local to state government through passage of the landmark Gaming Control Act of 1949. *See* Faiss, Nevada Gaming Statutes: The Evolution and History, at 3. The State's current two-tiered regulatory structure, involving the Nevada Gaming Control Board (NGCB) and Nevada Gaming Commission (NGC), evolved from there. *Id.* at 4–6.

With the passage of the Gaming Control Act of 1949, Nevada became the first state in the nation to legalize sports betting. *See* Jennifer Carleton et al., "Nevada" in The Gambling Law Review 147 (Carl Rohsler ed. 2016), https://perma.cc/3BSY-UYMZ (last accessed September 22, 2025). The Act covers all forms of gaming in Nevada, including sports and other event betting. *See* NRS § 463.160(1)(a), (4). Specifically, the Act regulates the operation of a "sports pool" in the State, which is defined as "the business of accepting wagers on sporting events or other events by any system or method of wagering." *Id.* § 463.0193.

Nevada gaming laws seek to ensure that gaming in the State is "conducted honestly and competitively" and "is free from criminal and corruptive elements." NRS § 463.0129(1)(b). To that end, the Act requires every gaming operator to obtain a license. *Id.* § 463.160(1). The State thoroughly investigates each applicant's background before issuing a license. *Id.* § 463.1405(1). For corporate applicants, the State also individually investigates and licenses the directors and officers and ensures that the corporation is fiscally sound. *Id.* §§ 463.490, 463.530. Publicly traded corporations that serve only as holding companies do not need to obtain licenses but must register with the State, and the State may require their officers or directors to obtain licenses and satisfy suitability requirements. *Id.* §§ 463.625, 463.633, 463.637. Licensees must pay licensing fees and keep detailed records of their gaming operations for inspection by the State. *Id.* §§ 463.400, 463.670.

Nevada gaming laws also seek to protect the public welfare. No person under the age of 21 may engage in gaming, including sports betting. NRS § 463.350(1)(a). The State maintains a list of persons who may not participate in gaming activities. *Id.* § 463.151(2). And the State funds and operates services to help those suffering from problem gaming. *See id.* § 458A.010 et seq.

## II. Commodity Exchange Act[2]

Compared to Nevada's 164-year regulation of gambling, federal regulation of commodities is a relatively recent development. Congress enacted the Commodity Exchange Act (CEA) in 1936, which is overseen by the Commodity Exchange Commission, a division within the U.S. Department of Agriculture. Pub. L. No. 74-675, § 3, 40 Stat. 1491, 1491 (1936). At the time of its enactment, the CEA regulated commerce in certain agricultural commodities, such as wheat, cotton, rice, and corn, including futures contracts based on those commodities.[3] *Id.*

In 1974, following major price-manipulation scandals, Congress amended the CEA to strengthen federal regulation of the futures markets. *See* Pub. L. No. 93-463, 88 Stat. 1389 (1974). Congress expanded the CEA to cover nearly all commodities, including non-agricultural commodities. *Id.* § 201(b). Congress also created the Commodity Futures Trading Commission (CFTC) to centralize federal oversight of futures markets; before then, that responsibility was shared by the Department of Agriculture and other agencies. *Id.* § 101(a). Congress accordingly conferred "exclusive jurisdiction" over futures contracts to the CFTC, *id.* § 201(b), "to consolidate federal regulation of commodity futures trading in the Commission," *Merrill Lynch*, 456 U.S. at 386–87.

In 2010, Congress enacted the Dodd-Frank Act in response to the 2008–2009 financial crisis. The Act amended the CEA to cover swaps. *See* Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658–754 (2010). Generally speaking, a swap is an agreement between two parties to exchange (or swap) financial obligations. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042 (9th Cir. 2003).

---

[2] Pursuant to FRE 201, State Defendants request that the Court take judicial notice concerning the enactment and evolution of the Commodity Exchange Act.

[3] A futures contract is a contract to buy or sell a specific amount of a commodity at a predetermined price on a specified date in the future. *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). Businesses use futures contracts to hedge against price volatility. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 390 (1982). For example, a coffee roaster that expects prices to rise can purchase a contract to buy beans at a fixed price for delivery in 6 months, to lock in that price.

For example, if one company has a fixed-rate loan, and another company has a variable-rate loan, the companies can agree to swap interest payments. *Id.* Other common swaps involve swapping financial obligations on foreign currencies or commodity prices. *Id.* Like futures, companies use swaps to hedge risk. *Id.* at 1043. Before the Dodd-Frank Act, swaps largely were unregulated. Cong. Rsch. Serv., R41350, The Dodd-Frank Wall Street Reform and Consumer Protection Act 19 (2017) (The Dodd-Frank Act).

Congress added "swaps" to the CEA because certain swaps had exacerbated the financial crisis. The Dodd-Frank Act at 3. Many financial institutions had entered into a type of swap called a "credit default swap" to hedge against the risk that sub-prime mortgages would default. *Id.* In a credit default swap, one party makes periodic payments to the other party, and in return, receives a payout if an underlying financial instrument (like a mortgage) defaults. *See* Black's Law Dictionary (12th ed. 2024). Some institutions had sold so many credit default swaps that, when housing prices fell, causing mortgages to default, the institutions risked collapse. The Dodd-Frank Act at 3.

In the Dodd-Frank Act, Congress expanded the CFTC's remit to include "swaps." 7 U.S.C. § 2(a). Congress provided a detailed, six-part definition of "swap" that reflects the many forms of swaps in the market. *Id.* § 1a(47)(A). Each part describes a financial instrument involving a financial, economic, or commercial event or measure that is understood in the industry to be a swap. As relevant here, one part covers an agreement "that provides for any payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).

Congress specified that all trading in swaps must occur on CFTC-registered designated contract markets (DCM) unless both parties to a swap are regulated financial institutions, major corporations, or similar entities. 7 U.S.C. § 2(e); *see id.* § 1a(18). To offer a swap for trading, the operator of a DCM can self-certify that the swap complies with the CEA. *Id.* § 7a-2(c)(1). The swap then immediately may be traded without any further action by the CFTC. *Id.* § 7a-2(c)(2). The CFTC can choose to initiate a formal review after self-certification. In particular, under the "special rule," the CFTC "may" disallow a swap that involves "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "gaming." *Id.* § 7a-2(c)(5); *see* 17 C.F.R. § 40.11(a) (prohibiting trading of a swap that

"involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law").

The CEA contains a number of provisions that address how the CFTC's authority relates to state law. In addition to the special rule, the CEA includes a savings clause immediately after the exclusive jurisdiction provision. That savings clause provides: "Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of . . . any State." 7 U.S.C. § 2(a)(1)(A).

Apart from the exclusive jurisdiction provision, the CEA also contains express preemption clauses. Nothing in those clauses says that the CFTC displaces the application of state gaming law generally. There is one express preemption provision that addresses gaming, but its scope is quite narrow; it specifies that the CEA "preempt[s] the application of any State . . . law that prohibits or regulates gaming" as to transactions that are exempted from the CEA's requirements. 7 U.S.C. § 16(e)(2). Those exemptions are not at issue; Robinhood does not claim that Section 16(e)(2) applies in this case. Another express preemption provision specifies that a swap "may not be regulated as an insurance contract under the law of any State." *Id.* § 16(h).

The CFTC has initiated several rulemakings addressing its authority to regulate swaps. In 2012, the CFTC promulgated a rule (jointly with the SEC) in which it stated that "swaps" do not include "consumer and commercial arrangements that historically have not been considered swaps," such as insurance contracts or mortgages. Further Definition of ''Swap," 77 Fed. Reg. 48208, 48246 (Aug. 13, 2012). Thus, the CFTC has recognized that "swaps" should be construed with a view to avoid disturbing historic areas of state regulation.

Then, in 2024, the CFTC proposed a rule that would categorically bar DCMs from offering events contracts based on the outcome of sports events. *See* Event Contracts, 89 Fed. Reg. 48968, 48976 (proposed June 10, 2024). The CFTC specifically noted that it was not proposing to displace state gaming law, and it never suggested that it has the authority to do so. *Id.* at 48982–83. It instead stated that it "does not believe that it has the statutory mandate nor specialized experience appropriate to oversee" gaming. *Id.* Notably, both dissenting Commissioners agreed with the majority that the CEA does not displace state gaming law. *Id.* at 48997 (statement of Commissioner Mersinger); *id.* at 48999 (statement of

Commissioner Pham). Although the proposed rule was withdrawn, it reflects the CFTC's understanding that the CEA does not override state gaming law.

### III. Robinhood's Operations

Robinhood is registered with the CFTC as a futures commission merchant (FCM). ECF No. 1, ¶ 9. Robinhood represents that, on March 17, 2025, it launched its prediction markets hub through which customers can participate in so-called "sports event contracts." *Id.*, ¶ 30. Although Robinhood customers place orders for sports event contracts through Robinhood, the trades themselves take place on DCM Kalshi's exchange. Robinhood holds no Nevada gaming license.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm; (3) the balance of the equities tips in its favor; and (4) the injunction is in the public interest. *Id.* at 21. Where the party opposing injunctive relief is a government entity, the potential hardship and the public interest considerations are merged. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts should pay particular attention to the public consequences when considering a request for injunctive relief. *Winter,* 555 U.S. at 24. They must also consider the effect on each party and balance the competing claims of harm. *Id.*

## ARGUMENT

### I. Robinhood Is Unlikely to Succeed on the Merits

Robinhood alleges that, with respect to sports event contracts, state gaming law is preempted by the CEA either expressly or impliedly. ECF No. 1, ¶¶ 50–62. Robinhood appears to assert three grounds for preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. *See id.* First and foremost, Congress never intended sports events contracts of the type offered by Robinhood to fall under the definition of "swaps" or "excluded commodities" in the CEA. Even if sports event contracts are considered to be swaps, Robinhood has not shown it is likely to succeed on any of these theories.

**A.  Congress Did Not Intend Sports Events Contracts to Be Swaps or Excluded Commodities Subject to the CEA**

Contrary to Robinhood's arguments, neither the text nor the history of the CEA supports the notion that Congress intended that sports betting repackaged as sports event contracts would fall under the auspices of the CEA. And interpreting the CEA in such a manner would lead to absurd results.

**1.  The Plain Text of the CEA Cuts Against Defining Sports Events Contracts as "Swaps"**

Robinhood claims, with minimal analysis, that its sports event contracts are "swaps" as defined by the CEA. The CEA defines "swap," in relevant part, as (1) "any agreement, contract, or transaction" that (2) "provides for any purchase, sale, payment, or delivery" that (3) "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency **associated with a potential financial, economic, or commercial consequences**." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added).[4]

With respect to the requirement that a swap be "associated with potential financial, economic, or commercial consequences," Robinhood claims that "wins and losses in sporting events have obvious, significant financial consequences for the players, the teams, the owners or the schools they represent, their communities, the television networks that cover the matches, and other stakeholders." ECF No. 7, p. 21. While Robinhood focuses on the "potential financial, economic, or commercial consequences," it gives little analysis to the meaning of the term "associated with" and the question of the degree of "financial, economic, or commercial consequences" required to render an event contract into a swap.

"Associate" means to "connect or join together" or to "connect in the mind," Webster's New Collegiate Dictionary 68 (1995)—such as in the phrase "smoking is associated with lung cancer." Thus, events that are "associated with" potential financial, economic, or commercial consequences are those that inherently are financial, economic, or commercial in nature. Events that merely have some potential downstream consequences are not sufficient. In particular, the outcome of a sports event (e.g., who the winner of the event is, as opposed to whether the event takes place at all) generally is not inherently

---

[4] Robinhood's alternative argument that event contracts may be considered transactions in an "excluded commodity," ECF No. 7, p. 13, likewise requires those transactions to be "associated with a financial, commercial, or economic consequence," 7 U.S.C. § 1a(19)(iv). Thus, the analysis with respect to swaps applies equally to transactions in an excluded commodity.

financial, economic, or commercial in nature—except, perhaps, for the participants themselves.[5] *See Martin*, 2025 WL 2194908, at *7, n.4; 7 U.S.C. § 9(a).

Section 1a(47)(A)(ii), on which Robinhood relies, is one part of a six-part definition of "swap." *See* 7 U.S.C. § 1a(47)(A). When a definition contains multiple parts, a court should look to the other parts to inform the meaning of the part at issue. *Yates v. United States*, 574 U.S. 528, 543–44 (2015) (explaining the *noscitur a sociis* canon of construction). If all of the other parts share a common thread, then the court should interpret the part at issue to also contain that thread. *See, e.g., Beecham v. United States*, 511 U.S. 368, 371 (1994). An examination of the rest of Section 1a(47)(A) supports the plain language reading that more than incidental downstream financial, economic, or commercial consequences are required to render something a swap under subsection (47)(A)(ii).

Specifically, all parts of Section 1a(47)(A) describe financial instruments based on inherently financial, economic, or commercial events or measures that commonly are traded as swaps. The first and third parts cover specific financial instruments. *Id.* § 1a(47)(A)(i) (any contract "that is a put, call, cap, floor, collar or similar option" in any "financial or economic interests or property of any kind"); *id.* § 1a(47)(A)(iii) (any contract "that provides . . . for the exchange . . . of 1 or more payments based on the value or level of" any "financial or economic interests or property of any kind," including 22 named types of swaps). The fourth part covers any contract "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). The fifth part covers certain "security-based swap agreement[s]" in which "a material term is based on the price, yield, value, or volatility of any security." *Id.* § 1a(47)(A)(v). And the sixth part covers any contract "that is any combination or permutation" of contracts in the five previous parts. *Id.* § 1a(47)(A)(vi).

---

[5] Robinhood represents that its sports event contracts are "binary contracts that pay out depending on the occurrence or non-occurrence of a future event **that is beyond the control of the parties to the contract**," presumably in support of its argument with respect to its contracts being transactions in an excluded commodity. However, Robinhood goes on to cite the financial consequences for "the players, the teams, [and] the owners or schools they represent." ECF No. 7, p. 21. It is unclear whether Robinhood permits players, teams, owners, or schools involved in the sporting event to trade on the event or if there are sufficient controls in place to limit price and outcome manipulation. But this shows one of the glaring differences between a traditional event contract where, by way of Robinhood's example, "an orange grower may buy a contract predicting an early frost to offset the risk of loss of income from frost damage"—e.g., an event outside the orange grower's control but in which they have a financial, economic, or commercial interest they wish to hedge, ECF No. 7, p. 4, and a sporting event in which individuals that arguably may have a financial, economic, or commercial interest are in control of the outcome of the event.

The *noscitur a sociis* canon of construction thus confirms that an event-based swap must involve an event that is inherently financial, economic, or commercial, such that it would be recognizable to the industry as a swap. Further, the term itself being defined ("swap") also confirms that the definition should be limited to financial instruments known in the industry as swaps and should not "reach" far beyond the "ordinary meaning" of the term. *Bond v. United States*, 572 U.S. 844, 861–62 (2014).

Robinhood's expansive reading of Section 1a(47)(A)(ii) effectively erases the limiting language—"associated with a potential financial, economic, or commercial consequence"—of that section. Under Robinhood's reasoning, anything and everything could be a swap where there is a conceivable downstream consequence from the event. For example, which team of seven-year-olds wins a recreational little league championship may have economic consequences for the team's favorite pizza place where the team goes to celebrate or for the local realtor who sponsors the team and gets increased business from the newspaper article about the victory. Yet certainly this is not what Congress envisioned when amending the CEA. If it were, there would be no limit to what could be considered a swap and no state could touch any contract whatsoever as long as it appeared on a CFTC-regulated exchange.

Moreover, acceptance of Robinhood's logic would render superfluous the remaining parts of Section 1a(47)(A), as all the transactions described in those parts would fall under the catch-all provision of part ii—*i.e.*, all would have potential financial, economic, or commercial consequences. Take, for example, a credit default swap (listed in Section 1a(47)(A)(iii)), which is a contract under which the buyer will receive payment if an event with financial, economic, or commercial consequence occurs (a mortgage default). So that swap, along with everything else in the other parts, would be covered by Section 1a(47)(A)(ii), making those other parts superfluous. Such a result is inconsistent with settled rules of statutory construction. *See In re Saldana*, 122 F.4th 333, 343 (9th Cir. 2024) (canon against superfluity applies "with special force" when a proposed statutory construction "render[s] an entire subparagraph meaningless" (internal quotation marks omitted)), cert. denied, 2025 WL 1727392 (U.S. June 23, 2025).

**2.  The Rulemaking History of the CEA Cuts Against Defining Sports Events Contracts as "Swaps"**

Shortly after the enactment of the Dodd-Frank Act, the CFTC issued a rule to further define "swap." *See* 77 Fed. Reg. at 48208. In that rulemaking, the CFTC made clear that Section 1a(47)(A)(ii) should be limited to financial instruments that commonly are traded as swaps. It adopted, jointly with the SEC, a definition of "swap" that excludes "consumer and commercial arrangements that historically have not been considered swaps." *Id.* at 48246.

The CFTC applied that definition to explain that insurance contracts and other common contracts do not fall within the definition of "swap." The CFTC recognized that if Section 1a(47)(A)(ii) were to be read expansively, insurance contracts would come within that provision—they are contracts that provide for payment when an event associated with a potential economic, financial, or commercial consequence occurs (e.g., a fire). 77 Fed. Reg. at 48212. But the CFTC rejected that view. It explained that insurance products traditionally are regulated by States, not "under the CEA," and there was no "suggest[ion] that Congress intended for traditional insurance products to be regulated as swaps." *Id.* at 48212 & n.29. Along similar lines, the CFTC also excluded "mortgages," "automobile loans," and "employment contracts"—along with myriad other common contracts that historically have been regulated by the States—even though they could come within an expansive definition of "swap" under Section 1a(47)(A)(ii). *Id.* at 48246–48.

The CFTC's reasoning applies equally to sports wagers. As with insurance contracts, sports wagers traditionally have been regulated by the States, *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003), and there is no indication that Congress intended to change that in the Dodd-Frank Act. Notably, in its 159-page rulemaking in which it canvassed all manner of consumer and commercial contracts that might come within the definition of "swap," the CFTC never once mentioned sports wagers. *See* 77 Fed. Reg. 48208. The considered, contemporaneous view of the CFTC that Section 1a(47)(A)(ii) should cover only financial instruments understood by the industry to be swaps is powerful evidence of the provision's meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

### 3. Accepting Robinhood's Argument Would Lead to Absurd Results

Accepting Robinhood's argument that its sports event contracts are "swaps" could lead to the dangerous conclusion that a sports bet taken by a licensed Nevada sports book is likewise a "swap," because it is (1) an "agreement" between bettor and sports book that (2) provides for "payment" that (3) is dependent on an event "with a potential financial, economic, or commercial consequence." *See* 7 U.S.C. § 1a(47)(A)(ii). If this were the case, any licensed sports book would be in violation of the CEA for offering swaps outside a CFTC-designated exchange on "any other board of trade, exchange, or market." *See* 7 U.S.C. §§ 2(e), 6(a)(1). Such an absurd result cannot be countenanced. *See Arizona St. Bd. for Charter Schools v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006).

## B. Even if Sports Events Contracts Are Swaps, the CEA Does Not Preempt State Gaming Law in Its Entirety

"In all pre-emption cases," courts start by presuming that Congress did not preempt state law, "particularly" in cases involving "a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). Gaming is such a field; "the regulation of gambling lies at the heart of the state's police power." *Artichoke Joe's*, 353 F.3d at 737 (internal quotation marks omitted); *accord Flynt v. Bonta*, 131 F.4th 918, 930 (9th Cir. 2025). The Supreme Court has agreed that regulating gaming "is concededly within the police powers of a state," *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905), and that federal law "defer[s] to, and even promote[s], differing gambling policies in different States," *Greater New Orleans Broadcasting Ass'n, Inc. v. United States,* 527 U.S. 173, 187 (1999); *see Murphy v. NCAA*, 584 U.S. 453, 458–61 (2018) (describing the history of State gaming regulation, including of sports betting). Thus, if the CEA "is susceptible of more than one plausible reading," this Court should "accept the reading that disfavors pre-emption." *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008).

### 1. Express Preemption

Robinhood relies upon the CEA's exclusive jurisdiction clause, 7 U.S.C. § 2(a)(1)(A), to support a claim of express preemption. ECF No. 7, pp. 13–15. But "exclusive jurisdiction" is not language of express preemption. An express preemption provision is one that contains "explicit preemptive language" that states an intent to supersede other law and specifies which law is superseded. *Pac. Gas & Elec. Co.*

*v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983). It must state, in so many words, that state law is preempted or that a State may not regulate on the subject. *E.g., Kansas v. Garcia*, 589 U.S. 191, 203 (2020) (construing 8 U.S.C. § 1324a(h)(2), which provides that "[t]he provisions of this section preempt any State or local law"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1215 (9th Cir. 2020) (construing 42 U.S.C. § 7543(a), which provides that "[n]o State . . . shall adopt or attempt to enforce any standard" other than the federal standard).

The CEA's exclusive jurisdiction provision does not say anything about preemption or state law. *See Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (the CEA "does not expressly preempt state law").[6] However, elsewhere in the CEA, Congress did include express preemption provisions that use the necessary language of preemption. One provision states that the CEA "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" in limited circumstances not applicable here. 7 U.S.C. § 16(e)(2). Another provision states that a swap "may not be regulated as an insurance contract under the law of any State." *Id*. § 16(h)(2).

The above examples show that Congress knows how to preempt state law when it wants to do so. Robinhood conspicuously does not cite these provisions of the CEA. Nor can Robinhood cite a similar provision of the CEA preempting all state gaming law; it simply does not exist.[7]

### 2. Field Preemption

Field preemption occurs when "federal law so thoroughly occupies a legislative field" that there is "no room for the States to supplement it." *Nat'l Fed. of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733 (9th Cir. 2016) (internal quotation marks omitted). As this Court recognized in *Kalshi v. Hendrick*, it is clear that Congress intended for the CEA to have some field preemptive effect. 2025 WL 1073495, at *6. But, as the district court in Maryland explained, the analysis does not end there. *See Martin*, 2025

---

[6] The point of the provision is to specify which federal agency oversees futures markets. *Merrill Lynch*, 456 U.S. at 387. Before 1974, that responsibility was allocated between "the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General." *Id.* at 363. Congress enacted "the exclusive jurisdiction provision . . . only to consolidate federal regulation of commodity futures trading in the Commission," *id.* at 386–87—not to preempt state law.

[7] To the extent Robinhood asserts that this Court's prior decision in *Kalshi v. Hendrick* ruled that the CEA expressly preempts state gaming laws, *see* ECF No. 7, p. 15, Robinhood is incorrect. Importantly, there is no claim of express preemption in *Kalshi v. Hendrick*, and therefore the issue was not before the Court. *See Kalshi v. Hendrick*, No. 2:25-cv-00575 (D. Nev.) at ECF No. 1, p. 2 ("Nevada law is both field-preempted and conflict-preempted.").

WL 2194908, at *7. The question then is what the "pertinent field" is, *Nat'l Fed. of the Blind*, 813 F.3d at 737, and specifically whether it includes gaming regulation.

In the Motion's description of the legislative history of the 1974 amendment to the CEA, Robinhood quotes the Conference Committee's statement that the "exclusive jurisdiction" would "preempt the field **insofar as futures regulation is concerned**." ECF No. 7, pp. 15–16 (emphasis added) (quoting H.R. Rep. No. 93-1383, at 35–26 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897). The Conference Committee went on to say that "[t]herefore, if any substantive State law regulating futures trading was **contrary to or inconsistent with** Federal law, the Federal law would govern. In view of the broad grant of authority to the Commission to regulate the **futures trading industry**, the Conferees do not contemplate that there will be a need for any supplementary regulation by the States." *Id.* (emphasis added).

Two things are striking about this legislative history. First, the Conference Committee statement clearly recognizes by implication that if a substantive State law is **not contrary to** or is **consistent with** Federal law, there could be concurrent, or in the Conferees' own words, supplementary, regulation by the States.[8] Second, the statement that the Conferees did not contemplate a need for supplemental regulation by the States is of little to no value, because in 1974 sports betting was illegal in the vast majority of the 50 states. Congress could not have contemplated that, 50 years later, sports betting would be legal in the majority of jurisdictions and offered a form of ostensible "futures trading."

Despite Robinhood's assertions to the contrary, the CEA does not provide a "comprehensive" regulatory scheme as related to sports event contracts. Indeed, neither the 1974 nor the 2010 amendments to the CEA had the benefit of the Supreme Court's decision in *Murphy*, which opened the door to nationwide sports betting. Accordingly, many of the protections built into state gaming law, developed over more than a century-and-a-half, are noticeably absent from the CEA. This includes age restrictions, suitability determinations, dispute resolution mechanisms, problem gambling provisions, and other consumer protections.

---

[8] Indeed, Robinhood recognizes that the motivation behind the 1974 amendments was a concern that "states 'might step in to regulate the futures markets themselves' and create '**conflicting** regulatory demands.'" ECF No. 7, p. 16 (quoting *Kalshi v. Hendrick*, 2025 WL 1073495 at *6) (emphasis added).

The reasonable interpretation of what the field is that Congress is preempting, if there is such a field to begin with, is much narrower than Robinhood makes it out to be. As the district court in Maryland explained, the better reading of the CEA is that "Congress did not clearly and manifestly intend to preempt state laws with respect to sports wagering." *Martin*, 2025 WL 2194908, at *8. Instead, the preempted field is the core regulation of swap markets and not gaming regulation. That is, a State cannot create a "parallel regulatory regime" for swap markets, *id.* at *7, but when a swap also is a sports wager, the State can regulate it and its sponsor. At a minimum, this reading is entirely plausible, and in preemption cases, courts should adopt the plausible reading that "disfavors pre-emption." *Altria*, 555 U.S. at 77 (internal quotation marks omitted).

### 3. Conflict Preemption

Robinhood last argues, in conclusory fashion, that state gaming law is conflict preempted by the CEA. It argues without citation that "[b]ecause it is the *transaction* on a regulated exchange over which the CFTC has exclusive jurisdiction, the CFTC must have jurisdiction over the *entire* transaction and all participants." ECF No. 7, p.19. Robinhood utterly fails to analyze the two different forms of conflict preemption: impossibility preemption and obstacle preemption. Neither applies here.

#### a. Impossibility Preemption Does Not Apply

Impossibility preemption applies when it would be "impossible to comply with both federal and state law," *Am. Apparel & Footwear Ass'n v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024)—for example, if a state law required a warning label to be blue and the federal law required the label to be red. Dual compliance must actually be impossible; speculation that compliance may be difficult or impossible is "insufficient." *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 629 (9th Cir. 2024).

As noted, Robinhood's Motion does not elaborate on how compliance with both state and federal law would be impossible with respect to its offering sports event contracts. Its Complaint is similarly opaque; the Complaint attempts to frame the conflict as one where Nevada is trying to determine "*which* event contracts are permitted on CFTC-designated exchanges." ECF No. 1, ¶ 62. In Robinhood's estimation, "[i]f the Board were permitted *also* to make a determination about whether event contracts on a CFTC-regulated exchange were permitted, there would be a direct conflict between federal and state regulation because the CFTC has already impliedly approved those same event contracts." *Id.*

Apparently, Robinhood's position is that "the Board has threatened to preclude trading of those same event contracts [impliedly authorized by the CFTC] by enforcing Nevada gaming laws." *Id.*

Robinhood manufactures a catch-22 to argue the existence of a conflict: either it follows State law and forfeits its ability to list sports event contracts on its exchange, or it follows federal law and risks civil and criminal penalties from the State. But a third option exists: apply for state licensure and comply with both state and federal law—federal law with respect to Robinhood's operation as a futures commission market and state law with respect to any contracts that meet the definition of a "wager" under Nevada law. Robinhood has not met its burden to show that dual compliance is actually impossible.

### b.     Obstacle Preemption Does Not Apply

Obstacle preemption applies when the application of state law would "stand[] as an obstacle" to Congress's purposes in enacting a federal law. *Am. Apparel*, 107 F.4th at 943. Just as Robinhood has not explained how dual compliance with state and federal law would be impossible, it has not shown how compliance with state gaming law with respect to contracts deemed "wagers" by the State would stand as an obstacle to Congress's purpose in the CEA. For that reason, Robinhood's claim of conflict preemption must fail.

## II.    Robinhood Has Not Shown that It Will Suffer Irreparable Harm

In seeking a preliminary injunction, a party must make a "clear showing" that, absent injunctive relief, it suffers irreparable harm that is both likely and imminent. *Winter*, 555 U.S. at 22 ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."); *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) (en banc) ("The Supreme Court has repeatedly cautioned that, absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way."). And because Robinhood "seeks to enjoin a government agency, '[its] case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs.'" *Midgett v. Tri-County Metro. Transp. Dist. of Or.*, 254 F.3d 846, 850 (9th Cir. 2001) (quoting *Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976)). "This 'well-established rule' bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury." *Id.* (quoting *Hodgers-Durgin*, 199 F.3d at 1042–43).

Robinhood's claim of irreparable harm—the threat of criminal and civil sanctions and reputational harm—is wholly a function of its own actions in contravention of Nevada law. *See* ECF No. 7, p. 21 ("**Because Robinhood has granted access to sports-related event contract trading for its Nevada customers**, and its Nevada customers have opened positions in sports-related event contracts, Robinhood faces the imminent threat of potential civil liability and criminal prosecution." (emphasis added) (internal citations omitted)). Indeed, Robinhood was put on notice by the State's cease-and-desist letter that its actions were unlawful.

Robinhood simply cannot use this Court's inherent equitable powers to rubberstamp its own violations—an illegal status quo that Nevada's gaming laws were designed to prevent. *See John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203–04 (D.D.C. 2017) (finding lack of irreparable harm in part because, even in "cases involving enforcement actions pursued in an unconstitutional manner or by an unconstitutional," "having to submit oneself to an enforcement proceeding typically does not constitute irreparable harm" (citing *Jarkesy v. SEC*, 803 F.3d 9, 26 (D.C. Cir. 2015)); *cf. Original Invs., LLC v State*, 542 F. Supp. 3d 1230, 1233–35 (W.D. Okla. 2021) (denying equitable relief because "[i]t is well-settled . . . that 'a court won't use its equitable power to facilitate illegal conduct.'"); *U.S. v. City of Los Angeles*, 595 F.2d 1386, 1391 (9th Cir. 1979) (suggesting preliminary injunctions are inappropriate to maintain an illegal status quo that a challenged "statute was designed to disrupt"). Conversely, any chance that Robinhood, as a result of NGCB action, will have to submit to federal (CFTC) enforcement actions— regulatory powers Robinhood does not challenge—does not constitute irreparable harm. *See John Doe Co.*, 235 F. Supp. 3d at 203–04; *Jarkesy*, 803 F.3d at 26, 28.

**III. The Balance of the Equities Weighs in the State's Favor**

It is vital that all gaming activity which occurs in Nevada or activity which is related to a licensed gaming establishment is strictly regulated and licensed. "It is established beyond question that gaming is a matter of privilege conferred by the State rather than a matter of right." *State v. Rosenthal*, 93 Nev. 36, 40, 559 P.2d 830, 833 (1977). "Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishment . . . ." NRS 463.0129(1)(c). "All establishments where gaming is conducted . . . must therefore be licensed, controlled and assisted to protect the public health, safety, morals, good order and

general welfare of the inhabitants of the State . . . ." NRS 463.0129(1)(d). An activity which reflects "discredit upon the State of Nevada or the gaming industry . . ." may be deemed an unsuitable method of operation by the NGCB and Nevada Gaming Commission. Because Robinhood is not licensed and its business model facilitates illegal gaming activities, the Court should deny Robinhood's Motion.

## IV. Significant Security Is Appropriate

Rule 65(c) of the Federal Rules of Civil Procedure allows a court to issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A district court has "wide discretion" in setting the amount of bond. *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999).

Although this Court in *Kalshi v. Hendrick*, 2025 WL 1073495 at *8, ordered only de minimis bond in the amount of $10,000, the New Jersey district court in *Flaherty*, 2025 WL 1218313 at *8, found that $100,000 bond was appropriate. This amount was "intended to mirror that of the maximum fine of a violation under" the New Jersey Sports Wagering Act. *Id.*

If this Court were to issue the preliminary injunction in Robinhood's favor, it should take the approach that the *Flaherty* Court did and order bond in the amount of the maximum administrative fine that can be imposed under state law, which is $500,000. *See* NRS 463.310(4)(d)(1), as amended by S.B. 46 (2025). This will ensure that, if the State is found to have been wrongfully enjoined, there is security available to compensate the State to some degree.

/ / /

/ / /

/ / /

**CONCLUSION**

For the foregoing reasons, Defendants request that Robinhood's Motion be denied in its entirety and, if it is granted, bond be set in the amount of $500,000.

DATED this 23rd day of September, 2025.

      AARON D. FORD
      Attorney General

      By: */s/ Jessica E. Whelan*
          Jessica E. Whelan (Bar No. 14781)
           Chief Deputy Solicitor General - Litigation
          Sabrena K. Clinton (Bar No. 6499)
           Senior Deputy Attorney General
          State of Nevada
          Office of the Attorney General

      *Attorneys for Mike Dreitzer, George Assad, Chandeni K. Sendall, Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, Nevada Gaming Commission and Aaron D. Ford*