Jordan T. Smith, Esq., Bar No. 12097
JTS@pisanellibice.com
**PISANELLI BICE PLLC**
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Telephone: (702) 214-2100
Facsimile: (702) 214-2101

Kevin J. Orsini (*pro hac vice*)
korsini@cravath.com
Antony L. Ryan (*pro hac vice*)
aryan@cravath.com
Brittany L. Sukiennik (*pro hac vice*)
bsukiennik@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Counsel for Plaintiff Robinhood Derivatives, LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ROBINHOOD DERIVATIVES, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>MIKE DREITZER, in his official capacity as Chairman of the Nevada Gaming Control Board, et al.,<br><br>    Defendants. | CASE NO.: 2:25-cv-01541-APG-DJA<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF ROBINHOOD'S MOTION FOR A PRELIMINARY INJUNCTION** |

**INTRODUCTION**

In *KalshiEx, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) (hereinafter "*KalshiEx*"), this Court determined that the same sports-related event contracts at issue in this case are subject to the Commodity Future Trading Commission's ("CFTC") exclusive jurisdiction and that Nevada's state gambling laws are thus preempted as applied to those contracts. Robinhood explained in its opening papers why the same result must follow here, and, in opposition, Nevada mostly recycles the same arguments the Court rejected in the *KalshiEX* litigation. With respect to Robinhood's likelihood of success on the merits, nothing new has been presented that would require a different result from *KalshiEX*.

Further, Defendants do nothing to undermine the fact that Robinhood will face irreparable harm absent an injunction: If Robinhood continues facilitating event contracts on Kalshi's exchange, it will be subject to civil and criminal prosecution; if it stops offering the contracts, it will face unrecoverable economic damages and reputational harm. The equities also tip in Robinhood's favor because Defendants are not harmed by the inability to enforce preempted laws, and the public interest weighs in favor of an injunction that would maintain centralized, federal regulation over designated contract markets ("DCMs") and thereby preserve investors' expectations. For these reasons, and the reasons explained in its original Motion, Robinhood respectfully submits that the Court should grant its Motion for a Preliminary Injunction because none of the arguments actually presented by Defendants merit any other outcome.

One final point bears emphasis at the outset. Earlier today, the Court issued a written ruling in *North American Derivatives Exchange, Inc. v. State of Nevada ex rel. Nevada Gaming Control Board* (No. 2:25-cv-00978-APG-BNW) (the "*Crypto.com* Order"), denying plaintiff's motions for a preliminary injunction and judgment on the pleadings. The Court's Order turns on whether sports-related event contracts based on the occurrence of certain *outcomes* can fall within the CEA's definition of "swap" or whether that term is limited to transactions that depend on the *occurrence* of an event itself. Given the Court's focus on this issue in *Crypto.com* and the timing of the *Crypto.com* Order, the parties have presented a proposed stipulation to the Court that would provide Robinhood with a one-week extension to file this brief and address the Order issued earlier today. The stipulation also proposes a sur-reply for Defendants on this issue. Because the Court has not entered that stipulation and proposed order,

1

1    Robinhood has confined this Reply to the issues actually presented by the Defendants in this litigation and

2    does not address the issues raised in the *Crypto.com* Order from earlier today.  In doing so, Robinhood

3    preserves all rights on that issue and continues to request that it be given the opportunity to submit

4    supplemental briefing.

5                                              **ARGUMENT**

6    **I.     Robinhood Is Likely to Succeed on the Merits of Its Claim.**

7           Defendants argue that:  (1) sports-related event contracts are not "swaps" because they are not

8    sufficiently associated with financial, economic or commercial consequences (Opp. at 9-13), and (2) even

9    if they are, the Commodities Exchange Act ("CEA") and CFTC regulations do not preempt Nevada

10   gaming law (*id.* at 13-17).  On the first point, Defendants' statutory analysis mischaracterizes Robinhood's

11   core arguments, ignores relevant statutory context, and misunderstands clear Congressional directives.

12   And on the second point, Defendants' preemption arguments are unavailing and fail for the reasons stated

13   in this Court's order in *KalshiEX*, which was well-reasoned and correctly decided.

14          **A.     Defendants' Statutory Construction Arguments Are Wrong.**

15          Defendants make various statutory arguments to take the relevant event contracts outside the

16   definitions of "swap" and transactions in an "excluded commodity" under the CEA.

17   7 U.S.C. § 1a(47)(A)(ii) & (19)(iv).  As noted above, none of those arguments is the argument that the

18   Court relied upon in the *Crypto.com* Order, which are therefore not addressed in this filing.  In any event,

19   the arguments that Defendants do make each fail.

20          *First*, Defendants argue that Robinhood fails to consider the degree of relation required for an

21   event or contingency to be "associated with" the kind of "financial, economic, or commercial

22   consequences" required by the CEA.  (Opp. at 9.)  But wins and losses in the sporting events underlying

23   sports-related event contracts unquestionably have potential and actual financial, economic, and

24   commercial consequences for various stakeholders.[1]    *See* Orsini Decl. ¶¶ 5-7; *see also KalshiEX*,

25

---

26   [1]      Defendants state that "[i]t is unclear whether Robinhood permits players, teams, owners, or schools
     involved in the sporting event to trade on the event."  (Opp. at 10 n.5.)  However, Robinhood has
27   protections in place to ensure that they cannot. *See* Appendix B, Re: KalshiEX LLC – CFTC Regulation
     40.2(a) Notification Regarding the Initial Listing of the "Will <team> win <title>?" Contract,
28   https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf (prohibiting current and
     former players, coaches, and staff of professional and collegiate sports leagues, as well as paid employees

                                                    2

1   2025 WL 1073495, at *5 n.3; *KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS,

2   2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025).  For example, if a sports apparel company wants to hedge

3   exposure to merchandise demand based on playoff results, it might enter an event contract tied to a

4   particular team making the playoffs.  The occurrence or nonoccurrence of that sports-related contingency

5   will have tangible, direct financial consequences for the company.

6      Sports-related event contracts are thus directly "associated with," that is, "related to," financial,

7   economic, or commercial consequences.   *Associated*, Merriam-Webster, https://www.merriam-

8   webster.com/dictionary/associated (last visited Oct. 14, 2025) (defining "associated" as

9   "related, connected, or combined together"); *Associate*, Britannica Dictionary,

10  https://www.britannica.com/dictionary/associate (last visited Oct. 14, 2025) ("When one thing

11  is associated with another, they happen together or are related or connected in some way.").  The phrase

12  "associated with" does not compel a more heightened degree of relation than what is embraced by its plain

13  meaning.  *See Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 556 (9th Cir. 2016) ("When a statute

14  does not define a term, we generally interpret that term by employing the ordinary, contemporary, and

15  common meaning of the words that Congress used." (internal quotation marks omitted)).

16     In a similar vein, Defendants invoke the *noscitur a sociis* canon to argue that the subsections of

17  7 U.S.C. § 1a(47)(A), when read together, "confirm[] that an event-based swap must involve an event that

18  is inherently financial, economic, or commercial, such that it would be recognizable to the industry as a

19  swap." (Opp. at 11.)  As an initial matter, courts only turn to canons of construction like "*noscitur a sociis*

20  . . . to resolve ambiguity, not create it."  *Yates v. United States*, 574 U.S. 528, 564 (2015).  However,

21  Defendants make no effort to identify any ambiguity here.  Moreover, even if it were appropriate for the

22  Court to use the canon of *noscitur a sociis* in this instance, the statute's plain text refutes Defendants'

23  construction.  Nothing in the definition of "swap" or "excluded commodity" suggests that an underlying

24  "event" or "contingency" must be inherently financial, economic, or commercial.  Rather, the text states

25  that an underlying "event" or "contingency" must be "associated with" a "financial, economic, or

26

27
_____

28  of the league, league participants, owners of teams and leagues, along with household members and
    immediate family members of such individuals).

3

1  commercial *consequence*."  7 U.S.C. § 1a(47)(A)(ii) (emphasis added); *see also id.* § 1a(19)(iv) (same).

2  That is, an event's consequences must be "financial, economic, or commercial," not the event itself.

3        Equally unavailing is Defendants' argument that the proper reading of the CEA proposed by

4  Robinhood would render superfluous the list of swaps specifically identified by Congress in Section

5  1(a)(47)(A)(iii).   (Response at 11.)  To be sure, many—if not most—of the specific swaps listed in that

6  subsection would satisfy the tests set forth in the prior subsection.  That is equally true under the reading

7  proposed by Defendants (which would still render superfluous the specific enumeration of multiple swaps

8  that are inherently financial in nature, such as—to take a single example—interest rate swaps).  The point

9  here, however, is that Congress has simply said that based on extensive experience in the trading of these

10  enumerated types of contracts, virtually all of them will be sufficiently associated with financial,

11  economic, or commercial consequences such that contract-by-contract review is unnecessary.  The mere

12  fact that many of the enumerated swaps would satisfy the definition of multiple subparts does not itself

13  render any of those subparts superfluous.[2]

14        Defendants argue that under Robinhood's reading of the CEA, "anything and everything could be

15  a swap where there is a conceivable downstream consequence from the event." (Opp. at 11.)  Not so.  The

16  definition of "swap" is broad but not boundless.  There are some transactions that, on their face, go far

17  beyond the clear Congressional intent.  For example, games between friends or family members, with no

18  "financial, economic, or commercial consequence" beyond the participants, are not covered.  Moreover,

19  the definition includes no fewer than 10 express exclusions, 7 U.S.C. § 1a(47)(B), which demonstrate that

20  the definition is not limitless and indicate that additional exemptions should not be implied.  *Silvers v.*

21  *Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (noting that under the "doctrine of *expressio*

22  *unius est exclusio alterius* as applied to statutory interpretation creates a presumption that when a statute

23  designates certain persons, things, or manners of operation, all omissions should be understood as

24  exclusions." (internal punctuation omitted)).  Defendants may be dissatisfied with how broadly Congress

25  defined swaps, but that is not a basis to ignore the clear meaning of the CEA.

26  ───────────────
[2]    Even if Defendants were right about their statutory construction arguments based on the way in
27  which they claim the subsections of the definition of "swap" work together—and they are not—those
arguments would have no bearing on whether sports-related event contracts are contracts in excluded
28  commodities because the term "excluded commodity" does not have the same subsections.
7 U.S.C § 1a(19)(iv).

*Second*, Defendants argue that the CFTC further defined "swap" as excluding "consumer and commercial arrangements that historically have not been considered swaps" and should therefore exclude sports-related event contracts.  (Opp. at 12 (citing 77 Fed. Reg. 48,208 (Aug. 13, 2012)).)   These exclusions—insurance contracts, mortgages, automobile loans, and employment contracts, *see* 77 Fed. Reg. 48,208, 48,217, 48,248 (Aug. 13, 2012) (distinguishing swaps from insurance products and consumer and commercial arrangements)—notably do not include event contracts, which, the CFTC understood (even before Dodd-Frank) to be regulated derivatives.  *See* CFTC, *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008). Moreover, in 2024, the CFTC published a notice of proposed rulemaking "to further specify the types of event contracts that involve 'gaming,'" which would have amended 7 C.F.R. § 40.11 to find that certain event contracts were not "in the public interest" under the Special Rule.   CFTC, *Event Contracts*, 89 Fed. Reg. 48,968 (June 10, 2024).  Although this proposed rule was not adopted, it reflects the CFTC's understanding that event contracts involving "the outcome of a game in which one or more athletes compete" are regulated derivatives.[3]   CFTC, *Event Contracts*, 89 Fed. Reg. 48,968, 48,975 (June 10, 2024).  Thus, the CFTC's exclusion of certain consumer and commercial arrangements cannot be used to exclude sports-related event contracts from the statutory definition of "swaps."

*Third*, there is no merit to Defendants' argument that if sports-related event contracts are swaps, a sports bet taken by a licensed Nevada sports book is likewise a swap, and any licensed sports book would therefore be in violation of the CEA for offering swaps outside a CFTC-designated exchange. (Opp. at 13.)  As an initial matter, Robinhood is not arguing, and the industry does not recognize, that sports bets are swaps.  Indeed, Defendants fail to identify any CFTC enforcement actions arising from bets taken at a sports book or any statement by the CFTC suggesting they would view bets taken at a sports book as within their regulatory authority.  Moreover, 7 U.S.C. § 16(e)(1)(B)(ii) confirms that the

---

[3]     After the CFTC proposed this rule by a 3-2 vote, the U.S. District Court for the District of Columbia decided *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024), *dismissed*, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025), which rejected the CFTC's construction of "gaming" as applied to event contracts involving the outcomes of political elections.  Since the court issued that decision, the three Commissioners who voted in favor of proposing the new event contracts rules are no longer with the CFTC.  Based on these developments and the CFTC's approval of event contracts on a contract-by-contract basis in 2025, the CFTC does not appear poised to issue a final rule along the lines of the 2024 Notice.

1    CEA does not displace the states' regulatory authority with respect to transactions that are not conducted

2    on DCMs.  That aside, the first step in Defendants' logic fails because it is not the case that if sports-

3    related event contracts are swaps, then so too are sports bets.  The purpose of the CEA is to create "a

4    system of effective self-regulation of trading facilities, clearing systems, market participants and market

5    professionals under the oversight of the [CFTC]".  7 U.S.C. § 5(b).  Because it concerns market integrity,

6    the products it covers are *tradeable* products.  *See* 77 Fed. Reg. 48,208, 48,217, 48,248 (Aug. 13, 2012)

7    (describing swaps as instruments "*traded* on organized markets and over the counter" (emphasis added)

8    and distinguishing swaps from insurance products and consumer/commercial arrangements on the basis

9    that the latter are not traded).  Thus, sports bets are at least not swaps because they are not tradeable.

10              **B.    Defendants' Remaining Arguments Are Foreclosed.**

11              Defendants first assert that a presumption against preemption is appropriate here (Opp. at 13), and

12   then contest that express, field or conflict preemption is present (*id.* at 13-17).

13              *Presumption Against Preemption*.  The presumption against preemption does not apply when

14   Congress makes preemption express.  Defendants argue that a presumption against preemption should

15   exist here because gambling is an area of regulation traditionally left to states.  (*Id.* at 13.)  However, the

16   relevant area of regulation is derivatives, which have been repeatedly exempted from state gambling laws[4]

17   and Congress has expressly brought under the exclusive jurisdiction of the CFTC.  7 U.S.C. § 2(a)(1)(A).

18   Moreover, while courts begin from a presumption against preemption in implied preemption cases, the

19   presumption against preemption has no place where, as here, "the statute contains an express pre-emption

20   clause."  *Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016)

21   (internal quotation marks omitted).  Here, no presumption applies because the "exclusive jurisdiction"

22   provision of the CEA expressly preempts state gambling laws to the extent they purport to regulate

23   Robinhood's facilitation of transactions on a DCM.  This provision is a reflection of Congress's clear and

24   manifest purpose to preempt the field with respect to transactions on DCMs, except in limited

25   circumstances set forth in the statute but not presented here.  *See* 7 U.S.C. § 13a-2.

26   _____

27   [4]    *See Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 205-06 (N.D. Ala. 1981)
     (holding that state gambling statute purporting to void all futures transactions was preempted by federal
     statutory scheme and would destroy the commodities market in Alabama); *Leist v. Simplot*, 638 F.2d 283,
28   304 (2d Cir. 1980) (reflecting that, despite attacks on "gambling" in the grain trade, Congress consistently
     recognized the benefits of legitimate speculation and trade).

6

1       *Express Preemption.*  This case involves express preemption through the "exclusive jurisdiction"

2   provision.  7 U.S.C. § 2(a)(1)(A).  Defendants contend that express preemption requires that a federal

3   statute contain language that contains the precise words that (1) state law is preempted or (2) the state may

4   not regulate the subject.  (Opp. at 13-14.)  This is simply not the law.  Courts regularly find that Congress

5   expresses its intent to preempt state law by using the phrase "exclusive jurisdiction."  *See, e.g.*, *Genesee*

6   *City. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1248 (D.N.M.

7   2011) ("Language in a statute that grants a federal agency 'exclusive authority' to regulate a particular

8   practice indicates Congress' intent to expressly preempt state regulation of that matter.");  *AES Sparrows*

9   *Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 598 (D. Md. 2007) (finding express preemption where the

10  "Commission shall have the *exclusive authority* to approve or deny an application for the siting,

11  construction, expansion, or operation of an LNG terminal" (internal quotation marks omitted) (emphasis

12  in original)).[5]

13      *Field Preemption.*  The scope of preemption here is the field of commodity futures and swaps

14  trading on DCMs.  *See* 7 U.S.C. § 2(a)(1)(A).  Defendants argue that Nevada's gambling laws are not

15  within the field that Congress intended to preempt because: (1) the "field" that Congress preempted is

16  "core regulation of swap markets," not gambling; (2) Robinhood supposedly mischaracterizes the 1974

17  Conference Committee report; and (3) the CEA does not provide a comprehensive regulatory scheme that

18  thoroughly occupies the field.  (Opp. at 14-16.)  However, Defendants' entire field preemption analysis

19  assumes, incorrectly, that sports-related event contract trading is gambling, and that the CEA preempts all

20  gambling laws.  When sports-related event contracts are properly understood as regulated derivatives, then

21  sports-related event contracts trading on DCMs fall within the field that Defendants agree Congress

22  intended to preempt—the "core regulation of swaps markets." (Opp. at 16)*.*  For more than 100 years, the

23  Supreme Court has understood that lawmakers intended for regulated derivatives to be treated differently

24  from ordinary wagers.  *See Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236,

25  249 (1905) ("It seems to us an extraordinary and unlikely proposition that the dealings which give its

26

27    [5]    Moreover, Defendants' argument pointing to express preemption language in some parts of the
    statute does not foreclose the possibility that the statute may nevertheless have some implied preemptive

28  effect.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001); *Freightliner Corp. v.*
    *Myrick*, 514 U.S. 280, 287–89 (1995).

1    character to the great market for future sales in this country are to be regarded as mere wagers or as

2    'pretended' buying or selling."). The CFTC maintains the same understanding of congressional intent to

3    this day. *See Event Contracts*, 89 Fed. Reg. 48,968, 48,981 (June 10, 2024) ("The Commission highlights,

4    however, the determination of Congress to identify 'gaming' as an Enumerated Activity, separate and

5    apart from [gambling] activity that is unlawful under federal or state law").

6    Defendants themselves recite the 1974 Conference Committee statement that "the Conferees do

7    not contemplate that there will be a need for any supplementary regulation by the States." (Opp. 15

8    (quoting H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894,

9    5897).) This is a clear expression of Congressional intent to preempt parallel regulation by the states.

10    Defendants' reasoning—that sports betting was illegal in most states at the time[6]—is no basis to ignore

11    this statement. "Any supplementary regulation" means any regulation in addition to federal law regulating

12    futures trading within the exclusive jurisdiction of the CFTC, as stated in the preceding sentence of the

13    Conference Committee report. 1974 U.S.C.C.A.N. at 5897.

14    Moreover, the CFTC's regulation of commodity futures and swaps trading on DCMs is assuredly

15    comprehensive, as shown by the thicket of regulations that govern DCMs like Kalshi and FCMs like

16    Robinhood. Accordingly, this Court correctly decided that the plain text of 7 U.S.C. § 2(a)(1)(A) likely

17    "reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the

18    transactions conducted on those exchanges." *KalshiEX, LLC*, 2025 WL 1073495, at *6; *see also KalshiEX*

19    *LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 WL 1218313, at *5 ("The exclusive-jurisdiction

20    language reflects an intent to occupy the field and the defendants cited no authority to the contrary.").

21    *Conflict Preemption.* Because the Court correctly held that the CEA occupies the relevant field of

22    regulation, it need not address Defendants' additional preemption arguments. Nevertheless, they fail as

23    well. Defendants argue that Robinhood has not shown that it would be impossible to comply with

24    Nevada's gaming laws and the CEA, nor that gaming laws present an obstacle to Congress's purpose in

25    enacting the CEA. These conflict preemption arguments both fail.

26    Implied conflict preemption exists in two instances: "where it is impossible for a private party to

27    comply with both state and federal law" (impossibility preemption), or where "the challenged state law

28    

---

[6]    Obviously, sports betting was already legal at that time in Nevada. (*See* Opp. at 4.)

1    stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"

2    (obstacle preemption). *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting *Crosby v. Nat'l*

3    *Foreign Trade Council*, 530 U.S. 363, 372-73 (2000)). For impossibility preemption, "the conflict must

4    be an actual conflict, not merely a hypothetical or potential conflict." *Chicanos por la Causa, Inc. v.*

5    *Napolitano*, 558 F.3d 856, 863 (9th Cir. 2009). "Although this does not foreclose challenges based on

6    future or anticipated conflicts, it does mean that 'speculative' conflicts are not sufficient." *Montana Med.*

7    *Ass'n v. Knudsen*, 119 F.4th 618, 623 (9th Cir. 2024) (quoting *Chicanos por la Causa*, 558 F.3d at 866).

8    The Court's field preemption finding precludes the need to consider impossibility preemption.

9    *KalshiEX, LLC*, 2025 WL 1073495, at \*6 n.6 (reflecting that where state law is field preempted, the Court

10    "need not address conflict preemption."). Moreover, state prosecutions for conduct on CFTC-designated

11    exchanges would clearly present an obstacle to the CEA's purpose. By granting the CFTC "exclusive

12    jurisdiction" over designated commodities exchanges, Congress expressly intended to exclude all other

13    attempts to regulate transactions on those exchanges, including Defendants' threatened enforcement of

14    state gambling laws. *See DGM Invs., Inc. v. New York Futures Exch., Inc.*, No. 01 Civ. 11602 (RWS),

15    2002 WL 31356362, at \*5 (S.D.N.Y. Oct. 17, 2002) ("In sum, the structure and history of the CEA indicate

16    that the propriety of conflict preemption depends upon the particular context in which a plaintiff seeks to

17    bring a state law action. When application of state law would directly affect trading on or the operation of

18    a futures market, it . . . is preempted."). The statutory design and legislative history of the CEA clearly

19    show that "Congress intended to subject" futures and commodities "to only one set of regulations." *Gade*

20    *v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992). For those reasons, Nevada's state gambling

21    laws, as applied to sports-related event contracts traded on DCMs, would present an obstacle to the

22    CFTC's enforcement of the CEA.

23    Accordingly, Robinhood is likely to succeed on the merits of its claims that Nevada's state

24    gambling laws are preempted by the CEA and CFTC regulations.

25    **II.    Robinhood Will Be Irreparably Harmed If Defendants Are Permitted to Enforce Preempted**
26    **State Gambling Laws.**

27    Robinhood will be irreparably harmed absent an injunction. Defendants' cease-and-desist letter

28    states their intent to prosecute Robinhood for conduct that is within the CFTC's exclusive jurisdiction.

9

1    Defendants have never disclaimed this intention.  To the contrary, the Response plainly acknowledges

2    "the threat of criminal and civil sanctions and reputational harm" absent an injunction and does not dispute

3    that such harm is substantial, imminent, and all-but-certain to occur.  (Opp. at 18.)    Nevertheless,

4    Defendants maintain that an injunction should be denied because any resulting harm would be "wholly a

5    function of [Robinhood's] own actions in contravention of Nevada law."  (*Id*.)

6        This argument is unpersuasive.  The Court has already found that Nevada's gambling laws are

7    preempted by the CEA, and a credible threat of prosecution pursuant to a preempted state statute is

8    sufficient to establish irreparable harm.  *See Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 381

9    (1992).  Further, given the Board's demand that Robinhood comply with preempted state law, Robinhood

10   cannot avoid irreparable harm without a preliminary injunction.  The State's threatened enforcement

11   creates a Catch-22:  If Robinhood continues offering access to event contracts in Nevada, it will face civil

12   and criminal prosecution and costly sanctions.  If Robinhood stops offering access to event contracts, it

13   will lose the confidence, business, and goodwill of more than 14,000 customers in Nevada who currently

14   rely on Robinhood's services.  Such losses cannot readily be remedied with damages, and even if they

15   could be, sovereign immunity bars Robinhood from collecting lost profits from the State under any

16   circumstances. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999).

17       Importantly, Defendants are not harmed by the entry of an injunction because they still have a

18   remedy under the APA for any claimed incursion on their right to regulate sports gambling in Nevada.

19   *See Ramsey v. Kantor*, 96 F.3d 434, 445 (9th Cir. 1996) ("Actions include the circumstance where the

20   responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals

21   under the Administrative Procedure Act or other applicable law as agency action.").  An injunction is the

22   only means of avoiding imminent, irreparable harm to Robinhood, and Defendants have offered no

23   evidence of harm to anyone else.

24   **III.    Defendants and the Public Have No Interest in the Enforcement of Preempted State Laws.**

25       Finally, the equities tip in Robinhood's favor.  The State of Nevada and the public can have no

26   interest in enforcing preempted state laws against Robinhood.  *See Valle del Sol Inc. v. Whiting*, 732 F.3d

27   1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable or in the public's interest to allow

28

1    the state . . . to violate the requirements of federal law, especially when there are no adequate remedies

2    available." (quoting *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011))).

3         Moreover, the public interest weighs in favor of maintaining the status quo. *See Chalk v. United*

4    *States Dist. Court Cent. Dist.*, 840 F.2d 701, 704 (9th Cir. 1988) ("The basic function of a preliminary

5    injunction is to preserve the status quo pending a determination of the action on the merits."). As it stands,

6    Robinhood's customers in Nevada, and throughout the United States, access event contacts on

7    CFTC-designated exchanges. *See Youth 71Five Ministries v. Williams*, No. 24-4101, 2025 WL 2385151,

8    at *5 (9th Cir. Aug. 18, 2025) (defining the "status quo" as "the legally relevant relationship between the

9    parties before the controversy arose, that is, before the action challenged in the complaint occurred."

10   (internal quotation omitted)); *Hubbard v. City of San Diego*, 139 F.4th 843, 853 n. 10 (9th Cir. 2025)

11   (same).

12        Robinhood's customers' trading activity is conducted pursuant to (and in reliance on) the

13   centralized regulatory regime Congress enacted through the CEA. Under that framework, Congress

14   brought event contracts under a unified set of regulations to avoid "the possibility that another State would

15   have different rules than not only [] the CFTC, but other States." *KalshiEX*, 2025 WL 1073495, at *7.

16   By enacting the CEA, Congress has already decided that the public interest is best served by centralized

17   regulation of activity conducted on DCMs. *See Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d

18   1013, 1046 (D. Idaho 2025) (noting "the public's strong interest in the rule of law being applied uniformly

19   and consistently, especially in matters implicating nationwide concerns").

<div align="center"><b>CONCLUSION</b></div>

21        For the reasons set forth above, the Court should grant Robinhood's motion for a temporary

22   restraining order and preliminary injunction.

23        DATED this 14th day of October, 2025.

24                                        PISANELLI BICE PLLC

25

26                                        By:    */s/ Jordan T. Smith*
                                                 Jordan T. Smith, Esq., #12097
27                                               400 South 7th Street, Suite 300
                                                 Las Vegas, Nevada 89101

28                                               and

                                        11

Kevin J. Orsini, Esq. (*pro hac vice*)
Antony L. Ryan, Esq. (*pro hac vice*)
Brittany L. Sukiennik, Esq. (*pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
375 Ninth Avenue
New York, New York 10001

*Counsel for Plaintiff*
*Robinhood Derivatives, LLC*