Todd L. Bice, Esq., Bar No. 4534
TLB@pisanellibice.com
**PISANELLI BICE PLLC**
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Telephone: (702) 214-2100
Facsimile: (702) 214-2101

Kevin J. Orsini (*pro hac vice*)
korsini@cravath.com
Antony L. Ryan (*pro hac vice*)
aryan@cravath.com
Brittany L. Sukiennik (*pro hac vice*)
bsukiennik@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

***Counsel for Plaintiff Robinhood Derivatives, LLC***

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ROBINHOOD DERIVATIVES, LLC, | CASE NO.:  2:25-cv-01541-JCM-DJA |
| Plaintiff, | |
| vs. | **CORRECTED REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF ROBINHOOD'S MOTION FOR A PRELIMINARY INJUNCTION** |
| MIKE DREITZER, in his official capacity as Chairman of the Nevada Gaming Control Board, et al., | |
| Defendants. | |

1

## TABLE OF CONTENTS

2

**Page**

3

TABLE OF AUTHORITIES ..................................................................................................... ii

4

INTRODUCTION ................................................................................................................... 1

5

ARGUMENT ........................................................................................................................... 2

6

I.      Robinhood Is Likely to Succeed on the Merits of Its Claim ........................................ 2

7

      A.      Sports-Related Event Contracts Traded on DCMs Are Regulated Derivatives. ................ 2

8

            1.      The CFTC Has Acted Within an Express Congressional Delegation of Authority To Regulate Sports-Related Event Contracts Traded on DCMs

9

                 as Derivatives. .................................................................................................... 2

10

            2.      Even If the Court Finds That This Question Is Properly Before It, Sports-Related Event Contracts Are Both Swaps and Contracts in Excluded

11

                 Commodities Within the Plain Meaning of the CEA. ........................................ 7

12

            3.      Congressional and CFTC Actions Confirm that There Is No Event / Outcome Distinction. ................................................................................... 11

13

            4.      A Finding that Sports-Related Event Contracts Are Regulated Derivatives

14

                 Would Not Mean All Sports Betting Is Illegal. ............................................... 13

15

      B.      Defendants' Arguments Concerning Robinhood's Likelihood of Success on the Merits Are Unavailing. .................................................................................... 14

16

            1.      Defendants' Statutory Construction Arguments Are Wrong. .............................. 14

17

            2.      Defendants' Remaining Arguments Are Foreclosed. ........................................ 16

18

II.     Robinhood Will Be Irreparably Harmed If Defendants Are Permitted to Enforce Preempted State Gambling Laws. .......................................................................... 19

19

III.    Defendants and the Public Have No Interest in the Enforcement of Preempted State Laws. ........................................................................................................................ 20

20

21

22

23

24

25

26

27

28

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AES Sparrows Point LNG, LLC v. Smith,*
  470 F. Supp. 2d 586 (D. Md. 2007) ................................................................................17

*Alden v. Maine,*
  527 U.S. 706 (1999) ......................................................................................................20

*Arizona v. Tohono O'odham Nation,*
  818 F.3d 549 (9th Cir. 2016) ........................................................................................15

*Atay v. Cnty. of Maui,*
  842 F.3d 688 (9th Cir. 2016) ........................................................................................19

*Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.,*
  198 U.S. 236 (1905) ......................................................................................................18

*Bostock v. Clayton Cnty., Ga.,*
  590 U.S. 644 (2020) ......................................................................................................10

*Buckman Co. v. Plaintiffs' Legal Comm.,*
  531 U.S. 341 (2001) ......................................................................................................17

*Chalk v. United States Dist. Court Cent. Dist.,*
  840 F.2d 701 (9th Cir. 1988) ........................................................................................20

*Clarke v. CFTC,*
  74 F.4th 627 (5th Cir. 2023) ...........................................................................................6

*Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Trust,*
  579 U.S. 115 (2016) ......................................................................................................17

*DGM Invs., Inc. v. New York Futures Exch., Inc.,*
  No. 01 Civ. 11602 (RWS), 2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002) ...................19

*Encino Motorcars, LLC v. Navarro,*
  584 U.S. 79 (2018) ........................................................................................................10

*Fiero v. Fin. Indus. Regul. Auth., Inc.,*
  660 F.3d 569 (2d Cir. 2011) ............................................................................................4

*Freightliner Corp. v. Myrick,*
  514 U.S. 280 (1995) ......................................................................................................17

*FTC v. Sysco Corp.,*
  113 F. Supp. 3d 1 (D.D.C. 2015) ....................................................................................4

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
  505 U.S. 88 (1992).................................................................................................19

*Gen. Fin. Corp. v. FTC,*
  700 F.2d 366 (7th Cir. 1983) ...................................................................................6

*Genesee Cnty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr.*
  *2006-3,* 825 F. Supp. 2d 1082 (D.N.M. 2011)........................................................17

*Idaho Org. of Res. Councils v. Labrador*,
  780 F. Supp. 3d 1013 (D. Idaho 2025) ...................................................................20

*In re Karim,*
  612 B.R. 904 (Bankr. N.D. Ill. 2020), *aff'd sub nom. Karim v. Illinois Dep't of Revenue,*
  No. 20-CV-813, 2021 WL 4499503 (N.D. Ill. Mar. 30, 2021)..................................8

*KalshiEx LLC v. CFTC,*
  No. CV 23-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024), *stay pending appeal denied,*
  119 F.4th 58 (D.C. Cir. 2024)........................................................................... passim

*KalshiEx LLC v. Flaherty,*
  No. 25-CV-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) ................15, 18

*KalshiEx, LLC v. Hendrick,*
  No. 2:25-CV-00575-APG-BNW, 2025 WL 1073495 (D. Nev. Apr. 9, 2025)........... passim

*Leist v. Simplot,*
  638 F.2d 283 (2d Cir. 1980)....................................................................................17

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..................................................................................................4

*Morales v. Trans World Airlines, Inc.,*
  504 U.S. 374 (1992)................................................................................................19

*North American Derivatives Exchange, Inc. v. State of Nevada ex rel. Nevada Gaming Control*
  *Board,* No. 2:25-cv-00978-APG-BNW, ECF No. 105 ..............................................1

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser,*
  945 F.3d 1076 (9th Cir. 2019) ..................................................................................7

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway,*
  515 F. Supp. 202 (N.D. Ala. 1981)........................................................................17

*Premca Extra Income Fund LP v. iRobot Corp.,*
  763 F. Supp. 3d 121 (D. Mass. 2025) ......................................................................4

*Prysmian Cables & Sys. USA LLC v. ADT Com. LLC,*
  665 F. Supp. 3d 236 (D. Conn. 2023).......................................................................8

*Pub. Serv. Co. of Colorado v. Cont'l Cas. Co.*,
   26 F.3d 1508 (10th Cir. 1994) ...................................................................................8

*Pulsifer v. United States*,
   601 U.S. 124 (2024) ...................................................................................................10

*Ramsey v. Kantor*,
   96 F.3d 434 (9th Cir. 1996) ......................................................................................20

*Rotkiske v. Klemm*,
   589 U.S. 8 (2019) .......................................................................................................11

*SEC v. McCarthy*,
   322 F.3d 650 (9th Cir. 2003) ....................................................................................10

*Silvers v. Sony Pictures Entm't, Inc.*,
   402 F.3d 881 (9th Cir. 2005) ....................................................................................16

*Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cnty.*,
   627 F.3d 1268 (9th Cir. 2010) ....................................................................................8

*Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*,
   40 F.4th 930 (9th Cir. 2022) .....................................................................................12

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ..................................................................................20

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) .....................................................................................................3

*Yates v. United States*,
   574 U.S. 528 (2015) ...................................................................................................15

**Statutes & Rules**

5 U.S.C. § 551(13) ...........................................................................................................3

5 U.S.C. § 702 ..................................................................................................................6

5 U.S.C. § 703 ..................................................................................................................6

5 U.S.C. § 704 ..................................................................................................................6

7 U.S.C. § 1a(19)(iv) .......................................................................................10, 11, 14, 15

7 U.S.C. § 1a(47)(A) ............................................................................................... passim

7 U.S.C. § 1a(47)(B) .......................................................................................................16

7 U.S.C. § 2(a)(1)(A) ....................................................................................3, 16, 17, 18

7 U.S.C. § 5(b) .................................................................................................................14

7 U.S.C. § 7a-2(c) ......................................................................................................2, 3, 12

7 U.S.C. § 16(e)(1)(B)(ii) ................................................................................................14

15 U.S.C. § 18a ..................................................................................................................4

15 U.S.C. § 8302(d)(1) ......................................................................................................3

Fed. R. Civ. P. 19(a)(1) ......................................................................................................6

**Other Authorities**

17 C.F.R. § 40.11 ......................................................................................................3, 4, 16

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) ......................................................12

*Associate*, Britannica Dictionary, https://www.britannica.com/dictionary/associate ...............................15

*Associated*, Merriam-Webster, https://www.merriam-webster.com/dictionary/associated ....................15

CFTC Letter No. 14-130 (Aug. 4, 2022), https://www.cftc.gov/csl/22-08/download .........................9, 13

CFTC Letter No. 25-36 (Sept. 30, 2025), https://www.cftc.gov/csl/25-36/download ............................5

*Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg.
   25,669, 25,670-71 (May 7, 2008) ............................................................................12, 16

*Contingency*, Black's Law Dictionary (2009) ................................................................10

Contract, https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf....................14

*Event*, Black's Law Dictionary (2009) ..............................................................................8

*Event Contracts*, 89 Fed. Reg. 48,968 (June 10, 2024) ..........................................5, 13, 16, 18

*Event*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/event......................8

*Event*, Oxford English Dictionary, https://www.oed.com/dictionary/event ..............................8

*Further Definition of "Swap,"* 77 Fed. Reg. 48,208 (Aug. 13, 2012)............................3, 14, 16

*Operation of a Small-Scale, Not-For-Profit Market for the Trading of Event Contracts for
   Educational Purpose* (July 14, 2025), https://www.cftc.gov/csl/25-20/download...........................13

*Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776 (July 27, 2011)........................3

Appendix B, Re: KalshiEX LLC – CFTC Regulation 40.2(a) ......................................14

Statement, Federal Reserve Board (Sept. 17, 2025),
   https://www.federalreserve.gov/newsevents/pressreleases/monetary20250917a.htm ........................8

**INTRODUCTION**

Robinhood hereby submits its corrected reply in support of its Motion for a Preliminary Injunction pursuant to the Court's October 16, 2025 Order. (ECF No. 50.) In *KalshiEx, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) ("*Kalshi*"), this Court determined that because the same types of event contracts at issue here are subject to the exclusive jurisdiction of the CFTC, Nevada state gambling law is preempted as applied to those contracts. Robinhood explained in its opening papers why the same result must follow here, and, in opposition, Nevada mostly recycles the same arguments the Court already rejected in the *Kalshi* litigation. Those arguments are dispensed with below in Section I.B.1 and I.B.2.

After Nevada submitted its opposition, this Court held a hearing and issued an Order in the related matter of *North American Derivatives Exchange, Inc. v. State of Nevada ex rel. Nevada Gaming Control Board*, No. 2:25-cv-00978-APG-BNW, ECF No. 105 (the "*Crypto* Order"). The Court addressed an issue not raised by the State in that action or in this one: whether an event contract that turns on the outcome of a sporting contest falls within the statutory definition of a "swap," based on the Court's view of the distinction between "the occurrence of an event" and the "outcome of an event." Because this issue was dispositive in *Crypto*, Robinhood addresses it at the outset. As explained below, Robinhood respectfully submits that the Court's decision in *Crypto* was in error because it effectively finds that the CFTC—which is actively regulating sports-related event contracts—is acting unlawfully and beyond its congressionally delegated authority, a finding that would only be proper in a direct challenge to the CFTC's actions under the Administrative Procedure Act ("APA"). This ruling is also inconsistent with the plain meaning of the word "event," which can and does include the outcome of a sporting contest, as well as CFTC guidance on the meaning of the word "event," and did not address whether sports-related event contracts fall under the statutory definition of "excluded commodities" (they do). (*See* Sections I.A.1 to I.A.4.)

The question before the Court here is narrow: does the CFTC's ongoing regulation displace state gambling laws as applied to event contracts traded on DCMs. The Court said yes in the *Kalshi* litigation, as did a federal court in New Jersey. Defendants' arguments regarding preemption provide no basis to disturb the Court's ruling. Robinhood requests that the Court grant its motion for preliminary injunction.

**ARGUMENT**

**I.    Robinhood Is Likely to Succeed on the Merits of Its Claim.**

This brief first addresses the issues raised by the Court in the *Crypto* Order and subsequently addresses the arguments made by Defendants in their opposition to Robinhood's Motion.

**A.    Sports-Related Event Contracts Traded on DCMs Are Regulated Derivatives.**

**1.    The CFTC Has Acted Within an Express Congressional Delegation of Authority To Regulate Sports-Related Event Contracts Traded on DCMs as Derivatives.**

The sole issue in this case is whether Congress has granted the CFTC exclusive jurisdiction over derivatives traded on DCMs, thereby preempting the application of state gambling laws.  There is no dispute—nor could there be—that Congress *has* authorized the CFTC to regulate the derivatives that trade on DCMs.  The CFTC has exercised its regulatory authority by engaging in active regulation and rule-making regarding event contracts, including event contracts that can be characterized as turning on the "outcome" of an event (*e.g.*, elections and sports contests).  Because the CFTC has determined not to block, and thereby has permitted, listing of and trading in the very event contracts on Kalshi's DCM at issue in this case, this action is not the right vehicle to challenge whether those contracts are properly listed under the CEA.  Instead, to the extent Nevada or any other entity wants to challenge whether the CFTC is exceeding its authority by permitting the listing of sports-related event contracts on DCMs, they must do so by bringing an APA challenge to the CFTC's actions.  Therefore, for the purposes of this litigation, the only relevant question is whether the regulatory authority granted to, and exercised by, the CFTC is exclusive (which the Court addressed in the *Kalshi* action).

The Court reasoned that it has "authority to interpret the CEA, including its definition of 'swap'" because "the CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap." (*Crypto* Order at 10-11.)  Respectfully, that is a misreading of the CEA, because the CEA does in fact expressly delegate to the CFTC the exclusive authority to decide whether products listed on a DCM qualify as "swaps" or other regulated derivatives.  To begin, Congress expressly delegated to the CFTC the authority and obligation to oversee the listing of new contracts, including event contracts, for trading on DCMs.  Under 7 U.S.C. § 7a-2(c)(1), a DCM may "elect to list for trading or accept for clearing any new contract, or other instrument" by providing the CFTC with a "written certification that the new contract

or instrument or clearing of the new contract or instrument" complies with the CEA.  Under the framework established by Congress, the DCM can then list the new contract for trading 10 business days later, unless the CFTC notifies the DCM that it requires additional time to analyze the new contract.  *Id.* § 7a-2(c)(2).  Alternatively, DCMs may seek the CFTC's review of a new contract prior to listing it.  *Id.* § 7a-2(c)(4)(A).  Congress has also expressly granted the CFTC the exclusive, and discretionary, authority to determine that certain types of event contracts are contrary to the public interest.  *See* 7 U.S.C. § 7a-2(c)(5)(C) (setting out the so-called "Special Rule").  Under that statute, the CFTC has promulgated a regulation that sets out a two-step process for CFTC review "on a case-by-case basis" of whether an event contract listed by a DCM should be barred under the Special Rule.  CFTC, *Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (adopting 17 C.F.R. § 40.11).

Regardless of which route a DCM chooses for listing contracts, Congress has directed that the CFTC "**shall** approve a new contract . . . unless the [CFTC] finds that the new contract . . . would violate [the CEA or the CFTC's regulations]."  *Id.* § 7a-2(c)(5)(B) (emphasis added).  If the CFTC determines that a new contract is inconsistent with the CEA or the CFTC's regulations—including because it does not meet the definition of a "swap" or other regulated derivative—the CFTC notifies the DCM that it objects to the listing of that contract.  *Id.* § 7a-2(c)(3)(B)(ii).  Each time the review period in the self-certification process for a new contract closes, the CFTC has made a determination either to object to the listing of the new contract, *id.* § 7a-2(c)(3)(B)(ii), or to permit the new contract to be listed (by not taking blocking action), *id.* § 7a-2(c)(2), (3)(B).  To implement this statutory regime, the CFTC has adopted specific procedures for determining, on a case-by-case basis whether event contracts should be prohibited under the Special Rule.  17 C.F.R. § 40.11(c).  These determinations are all committed to the CFTC's "exclusive jurisdiction."  7 U.S.C. § 2(a)(1)(A).  The CEA therefore *does* expressly delegate to the CFTC the exclusive power to decide whether products listed on a DCM qualify as a "swap."

Under this statutory regime, if the CFTC does not block a contract for listing on a DCM, that is itself an agency action.  *See* 5 U.S.C. § 551(13) (APA defines "agency action" to include "failure to act"); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (the term "agency action" "is meant to cover comprehensively every manner in which an agency may exercise its power").  This is precisely what the CFTC has done here with the Kalshi sports-related event contracts to which Robinhood provides

its customers access.  Congress made the reasoned decision to require the CFTC to notify a DCM *only* when the CFTC objects to the listing of a new contract.[1]  In this action, where the State does not bring an APA claim, this Court must defer to Congress's express delegation to the CFTC.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024) ("[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it.").  Here, the CFTC has acted within its statutory authority because it took an action—deciding whether a new contract may be listed on a DCM—that Congress delegated it the authority to take (regardless of whether the Court agrees with the CFTC's decision).  *See* 7 U.S.C. § 7a-2(c)(5)(B).

CFTC regulation 17 C.F.R. § 40.11 provides no basis for finding that the CFTC acted outside its authority.  (*Crypto* Order at 18-20.)  The CFTC acted pursuant to its regulation in allowing the review period to lapse on the contracts Kalshi self-certified and thereby permitted Kalshi to list them.  The CFTC could reasonably determine that sports-related event contracts may be listed consistent with 17 C.F.R. § 40.11(a) because they are not "gaming" contracts.  *See KalshiEx LLC v. CFTC*, 2024 WL 4164694, at *10-13 (D.D.C. Sept. 12, 2024), *stay pending appeal denied*, 119 F.4th 58 (D.C. Cir. 2024), *and dismissed*, 2025 WL 1349979 (D.C. Cir. May 7, 2025).  The CFTC could also reasonably determine that 17 C.F.R. § 40.11(c) permitted it to make the public interest determination even if an event contract facially falls within one of the categories enumerated in the Special Rule.  There is thus no reason to conclude that the CFTC acted inconsistently with its regulations.

The CFTC's decision to not object to the contracts at issue here is not the only way in which the CFTC has exercised its expressly delegated authority in this area.  The CFTC has also recently taken other affirmative regulatory action regarding event contracts, especially "outcome"-based event contracts.  In 2023, the CFTC issued an order prohibiting Kalshi from offering certain contracts related to the *outcome* of elections as contrary to the public interest.  *KalshiEx LLC v. CFTC*, 2024 WL 4164694, at *5.  In 2024,

---

[1] Similar regulatory schemes are common in the administrative landscape.  For example, under the Hart-Scott-Rodino Act, merging entities must file merger notices with the FTC and the DOJ.  15 U.S.C. § 18a; *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 20 (D.D.C. 2015).  If the waiting period expires with no second request from the reviewing agency, the parties may consummate the merger.  *Premca Extra Income Fund LP v. iRobot Corp.*, 763 F. Supp. 3d 121, 131 (D. Mass. 2025).  The Financial Industry Regulatory Authority (FINRA), an entity that, like a DCM, is a self-regulatory organization, is subject to a similar self-certification regime and *ex post* review by the SEC.  *See Fiero v. Fin. Indus. Regul. Auth., Inc.*, 660 F.3d 569, 571 (2d Cir. 2011); 15 U.S.C. § 78s(b)(2)(D).

the CFTC published a notice of proposed rulemaking, which was not adopted, "to further specify the types of event contracts that involve 'gaming.'" CFTC, *Event Contracts*, 89 Fed. Reg. 48,968 (June 10, 2024).[2] Most recently, the CFTC issued a Staff Advisory, which states, "The [CFTC's] Divisions are aware that certain registered entities and registrants are listing or facilitating the trading or clearing of sports-related event contracts. . . ." CFTC Letter No. 25-36, at 1 (Sept. 30, 2025), available at www.cftc.gov/csl/25-36/download. The CFTC is clearly well aware of the listing of sports-related event contracts for trading on DCMs, and its actions since 2023 demonstrate that it is actively engaged in overseeing and regulating event contracts traded on DCMs, including the type of event contracts at issue here.

In sum, Congress has expressly delegated authority to the CFTC to regulate DCMs and the contracts that are listed for trading on them (along with regulating other industry players, including Futures Commission Merchants ("FCM") like Robinhood (*see* ECF No. 7 at 7-8)). The CFTC has exercised that authority, has chosen not to object to the contracts at issue here, and is actively engaged in oversight and regulation of the sports-related event contracts at issue in this case.

If the Court holds, however, as it did in *Crypto*, that these event contracts are not swaps, then they fall *outside* the CFTC's jurisdiction under the CEA (*Crypto* Order at 2, 16), which means that the Court has effectively ruled that the CFTC cannot regulate these DCM-traded event contracts at all.[3] While that is a decision the Court may be authorized to make in a challenge to CFTC action, this case is not the proper action in which to determine whether the CFTC is exceeding the scope of its exclusive regulatory authority. Such claims must be brought pursuant to the APA, and parties cannot use a collateral proceeding to end-run the procedural requirements governing judicial review of administrative decisions. For example, in *Big Lagoon Rancheria v. California*, the Ninth Circuit denied California's attempt to

---

[2] After the CFTC proposed this rule by a 3-2 vote, the U.S. District Court for the District of Columbia decided *KalshiEx LLC v. CFTC*, which rejected the CFTC's construction of "gaming" as applied to event contracts involving the outcomes of political elections. 2024 WL 4164694, at *5. Since the court issued that decision, the three Commissioners who voted in favor of proposing the new event contracts rules have left the CFTC. Based on these developments, and the CFTC's approval of event contracts on a contract-by-contract basis in 2025, the CFTC does not appear poised to issue a final rule along the lines of the 2024 Notice.

[3] Such a ruling would wreak havoc on the uniform regulatory scheme Congress envisioned. Not only would these particular event contracts in Nevada not be subject to CFTC oversight, but a host of other event contracts, not just sports-related event contracts, would also be outside the CFTC's purview. Without a federal regulator, the burden would fall to each state to regulate these event contracts, and states would have to create or mobilize regulators to review and act with respect to such event contracts. However, not every state may be willing or able to step into the vacuum this would create.

collaterally attack a decision by the Bureau of Indian Affairs ("BIA"), where the State necessarily advanced an argument that "the BIA exceeded its authority when it took the eleven-acre parcel into trust." 789 F.3d 947, 953 (9th Cir. 2015) (en banc).  Because the State's argument amounted to an implicit challenge to the BIA's decision, the Ninth Circuit noted that "[t]he proper vehicle to make such a challenge is a petition for review pursuant to the APA."  *Id.* (citing cases).  However, California had not advanced an APA claim, nor joined the proper federal agencies or officials.  *Id.* at 954 (citing 5 U.S.C. §§ 702, 703). Thus, in that case, California's arguments concerning the scope of the BIA's authority to put land in trust failed "because the state [] failed to file the appropriate APA action."  *Id*.

Defendants' arguments are on the same footing here.  If the Court decides in this action that the CFTC was wrong and allows Nevada to enforce its gambling laws to regulate sports-related event contracts, the decision effectively invalidates the CFTC's final action permitting sports-related event contracts to trade on DCMs.  Defendants' arguments amount to a collateral attack on the CFTC's decision-making, and the appropriate vehicle for challenging that action is an APA claim.  5 U.S.C. § 704; *Big Lagoon Rancheria*, 789 F.3d at 953; *see, e.g.*, *KalshiEx LLC v. CFTC*, 2024 WL 4164694, at *1 (challenging CFTC's decision to deny trading of political event contracts under APA); *Clarke v. CFTC*, 74 F.4th 627, 640 (5th Cir. 2023) (challenging CFTC's withdrawal of no-action letter under APA).  But Defendants have not asserted an APA claim, and as *Big Lagoon Rancheria* makes clear, Defendants "may not bypass the specific method that Congress provided for reviewing adverse agency action," *i.e.*, the APA.  *See also Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983).  Here, the CFTC is not even a party—a further reason why this is an inappropriate vehicle to challenge its actions.  *See* Fed. R. Civ. P. 19(a)(1) (requiring joinder of a necessary party).

In sum, if the State of Nevada—or any other aggrieved party—wants a ruling that sports-related event contracts are not properly regulated at all by the CFTC, or that specific sports-related event contracts should not be approved for listing on a DCM, they must challenge the CFTC's actions through the APA. It is in *that* lawsuit that a court could review whether the CFTC is acting beyond its authority by permitting the trading of sports-related event contracts that turn on a game's outcome.  In this case, however, the only relevant question is whether the regulatory authority that the CFTC *is* exercising is exclusive, thereby preempting state law.  Here, the CFTC is exercising regulatory authority over the relevant subject matter,

Congress has expressly said that authority is exclusive, and so state laws that attempt to override those regulatory actions are preempted.  (*See infra* Sections I.B.1 & I.B.2.)

> **2.      Even If the Court Finds That This Question Is Properly Before It, Sports-Related Event Contracts Are Both Swaps and Contracts in Excluded Commodities Within the Plain Meaning of the CEA.**

If the Court nevertheless reaches the question whether sports-related event contracts fall within the definition in the CEA, it should find that sports-related event contracts are both "swaps" and contracts in "excluded commodities" within the relevant statutory definitions.  In the *Crypto* Order, the Court held that a distinction between an "event" and an "outcome" means that sports-related event contracts are not "swaps" within the meaning of Section 1a(47)(A)(ii).  (*Crypto* Order at 15.)  Outcomes of sports contests are encompassed, however, by the ordinary meaning of "event."  Sports-related event contracts also fall within the statutory definitions of "excluded commodity" and "swaps" because the outcome of a sporting event is a "contingency."  Moreover, sports-related event contracts are also agreements in "excluded commodities," because that term's definition is structured differently from the definition of "swap."  Each of these points is addressed in turn.

*First*, sports-related event contracts meet the statutory definitions of "swap" and a contract in an "excluded commodity."  Statutory interpretation must begin with the plain text of the CEA.  (*Crypto* Order at 9); *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019).  Under the CEA, a "swap" is "any agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).  The Court noted that the words "event" and "occurrence" are both used in the definition of "swap" and concluded that it could not ascribe the same meaning to both terms.  (*Crypto* Order at 14.)  While this starting point makes sense, the phrase "the occurrence of an event" already gives the words different meanings.  In this phrase, "occurrence" means the happening or taking place, and "event" is the thing that happens or takes place.  That distinction between "occurrence" and "event," however, does not answer what may constitute the "event" (*i.e.*, thing) that "occurs" (*i.e.*, happens or takes place).  For that answer, we must turn to the ordinary definition of "event."

While the word "event" is not defined in the statute, its ordinary definition encompasses outcomes.

*Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 627 F.3d 1268, 1270 (9th Cir. 2010).  As the Court recognized, several dictionaries support this reading.  (*Crypto* Order at 13 n.6.) An "event" can be defined as "[s]omething that happens."  *Event*, Black's Law Dictionary (2009).  While a football game between the Raiders and the Broncos on November 6 is "something that happens," the fact that the Raiders win the game is also "something that happens."  An "event" has been defined as "any of the contests in a program of sports," as well as a "condition" or "eventuality."  *Event*, Merriam-Webster Dictionary,  https://www.merriam-webster.com/dictionary/event.    Despite  one  dictionary  including "outcome" as an archaic use of the word "event" (*Crypto* Order at 15), that source is in the minority, and others include it as a contemporary meaning of "event. "  *See, e.g.*, *Event*, Oxford English Dictionary, https://www.oed.com/dictionary/event.  Thus, courts have recognized that "event" is "the outcome or consequence of anything."  *See Pub. Serv. Co. of Colorado v. Cont'l Cas. Co.*, 26 F.3d 1508, 1514-15 (10th Cir. 1994); *see also Prysmian Cables & Sys. USA LLC v. ADT Com. LLC*, 665 F. Supp. 3d 236, 246 (D. Conn. 2023) (stating that "event" is "a term that ordinarily refers to an 'outcome'"); *In re Karim*, 612 B.R. 904, 913 (Bankr. N.D. Ill. 2020) ("'Event'—a broad, general term—is defined as '[t]he outcome of an action or occurrence; a result, a consequence,' or '[s]omething that happens or takes place.'"), *aff'd sub nom. Karim v. Illinois Dep't of Revenue*, 2021 WL 4499503 (N.D. Ill. Mar. 30, 2021). For these reasons, under the plain meaning of "event," the Super Bowl is itself an event, but so too is the outcome.

Embracing the common definition of the word "event" to include outcomes does not create a textual overlap, because the word "outcome" is not used elsewhere in the definition of a swap.  Rather, by defining "event" *not* to include outcomes, the Court creates thorny, perhaps unsolvable, semantic problems, forcing courts, DCMs and the CFTC itself to engage in esoteric philosophical and linguistic debates about whether an event contract references a happening or an outcome of a happening.  Consider the Federal Reserve Board's recent decision to lower interest rates.  *See* Statement, Federal Reserve Board (Sept. 17, 2025), https://www.federalreserve.gov/newsevents/pressreleases/ monetary20250917a.htm.  Is the Fed's decision to lower interest rates itself an "event" (a thing that happens) or is the lowered interest rate the "outcome" of the Fed's meeting (where the meeting is the event that happens)?  Any distinction between these understandings is purely semantic—there is no principled way to distinguish them.

Along the same lines, consider political elections.  Event contracts referencing elections have long been understood to be covered by the CEA and subject to CFTC oversight.  *See, e.g.*, Vincent McGonagle (Director – Division of Market Oversight), Re: Withdrawal of CFTC Letter No. 14-130 (Aug. 4, 2022), https://www.cftc.gov/csl/22-08/download (referencing CFTC no-action letter for offering "binary option contracts concerning political election *outcomes*" (emphasis added)).  Who wins a political election is undoubtedly an event associated with great "financial, economic, or commercial consequences."  *See KalshiEx LLC v. CFTC*, 2024 WL 4164694, at *2.  And yet, if the Court's interpretation of the word "event" were correct, whether contracts referencing election outcomes are swaps properly traded on DCMs would be uncertain.  If Candidate A wins an election, is that the outcome of the "event" (the election), or is it in itself an "event" that occurs?  Congress could not have intended to let financial regulation turn on such theoretical debates about what a swap is; indeed, the very breadth of the swap definition suggests that the opposite is the case.  Congress intended the definition of "swap" to cover the waterfront of potential financial products, bringing them all under federal regulatory oversight.

The artificial nature of any distinction between "events" and "outcomes" can be seen by making non-substantive changes to common event contracts.  For example, taking the Court's Stanley Cup Finals example, if the Las Vegas Knights are up 3 games to 1 against the Florida Panthers in the finals and game 5 is upcoming, then game 6 will occur only if the Panthers win.  An event contract could be framed either as "The Panthers will beat the Knights in game 5" or "There will be a game 6"—both concern *exactly the same thing*, but, under the Court's paradigm, the former is an outcome and the latter is a contingency.  Or take credit default swaps, which are listed in the definition of "swap" in 7 U.S.C. § 1a(47)(A)(iii), and defined by Defendants as "a contract under which the buyer will receive payment if an event with financial, economic, or commercial consequence occurs (a mortgage default)."  (ECF No. 25 ("Opp.") at 11; *see also Crypto* Order at 16.)  The credit default swap is like a sporting event in that there is a date on which something will happen (a game; a mortgage payment coming due).  In both instances, the possible outcomes of that event are binary and known in advance (win or loss; payment or non-payment).  In both instances, the event may not happen at all (the game is rained out; the parties agree on a modification of the payment schedule).  Is a credit default swap a contract that references an event (a default) or an outcome (payment or non-payment)?  This example demonstrates that the choice of how to

describe the referenced event cannot be the means of determining whether a product is a regulated derivative.

*Second*, the plain text of the definitions of "swaps" and "excluded commodit[ies]" dispense with any need to distinguish between events and outcomes, because neither definition is limited to transactions involving "events." "Swaps" are contracts that turn on the occurrence of an "event **_or_** contingency." 7 U.S.C. § 1a(47)(A)(ii). Likewise, transactions in an "excluded commodity" can be associated with an "occurrence **_or_** contingency." *Id.* § 1a(19)(iv). In each instance, the use of the word "or" signifies that each word provides its own meaning. (*Crypto* Order at 14 (citing *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003))); *Pulsifer v. United States*, 601 U.S. 124, 151 (2024); *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018). A contingency is "[t]he condition of being dependent on chance; uncertainty." *Contingency*, Black's Law Dictionary (2009). The final result of a sporting contest is a "contingency" that depends on many uncertainties (like team line-ups and whether one team plays well) that may or may not occur. Thus, at a minimum, an "outcome" is a "contingency" associated with an event and is thus embraced by the text of Sections 1a(47)(A)(ii) and 1a(19)(A)(iv).

In *Crypto*, the Court declined to consider whether the outcome of a sporting event could be a contingency, but concluded that "a contingency in the swap definition means a contingent event." (*Crypto* Order at 15 n.9.) However, giving "contingency" this meaning effectively reads it out of the statute; it would add nothing beyond the term "event."[4] That is because a "contingent event" either occurs or does not occur depending on whether the contingency comes to pass—something that is already covered by the words "occurrence, nonoccurrence, or the extent of the occurrence of an event." Thus, under the Court's own reasoning, it cannot be right that "contingency" means "contingent event" because "Congress chose different words . . . and [the Court] must ascribe some significance to that decision."[5] (*Id.* at 14.)

*Third*, it remains the case that sports-related event contracts are not only "swaps," but also agreements and transactions involving "excluded commodities." This issue was not addressed in the

---

[4] The use of the term "contingency" in the definition of "excluded commodity" underscores that it would be improper to ascribe "contingent event" as its meaning. 7 U.S.C. § 1a(19)(iv). That section does not use the term "event" at all, so giving "contingency" this meaning would effectively be improperly adding statutory language where it does not exist. *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654 (2020).

[5] Further, as shown above in the Stanley Cup Finals example, what the Court calls a contingency can equally be framed as an outcome.

*Crypto* Order. While the Court viewed the presence of the word "event" as dispositive of whether a sports-related event contract is a "swap," the word "event" does not appear in the statutory definition of an "excluded commodity." Although "swaps" involve "the occurrence, nonoccurrence, or the extent of the occurrence of ***an event*** or ***contingency***," 7 U.S.C. § 1a(47)(A)(ii) (emphasis added), transactions in an "excluded commodity" only involve "an occurrence, extent of an occurrence, ***or contingency***." *Id.* § 1a(19)(iv) (emphasis added). Because the word "event" does not appear in the definition of "excluded commodity," any theoretical distinction between events and outcomes thus cannot limit its meaning. *See Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'"). Moreover, in the definition of "excluded commodity," the word "contingency" is at the same grammatical level as "occurrence," and because Congress used "or," a "contingency" can be an "excluded commodity" even if it is not an "occurrence." 7 U.S.C. § 1a(19)(iv); (*see also Crypto* Order at 15 n.9.) Notably, at least one court has already expressly determined that "event contracts are subject to regulation under the CEA as 'excluded commodities', and thus by the CFTC." *KalshiEx LLC v. CFTC*, 2024 WL 4164694, at *2.

The Court expressed a concern, which was also raised by Defendants, that the proper reading of the CEA proposed by Robinhood would render superfluous the list of swaps specifically identified by Congress in Section 1(a)(47)(A)(iii). (*Crypto* Order at 16-17; Opp. at 11.) To be sure, most—if not all—of the specific swaps listed in that subsection would satisfy the more general test set forth in the prior subsection. That is equally true under the reading in the *Crypto* Order. However, Congress determined, based on extensive experience in trading the enumerated types of contracts, that contract-by-contract review is unnecessary. The mere fact that many of the enumerated swaps would satisfy the definition of multiple subparts does not itself render any of those subparts superfluous.[6] Again, Congress's concern in the Dodd-Frank Act was to ensure that federal regulation would encompass all of these financial products.

### 3. Congressional and CFTC Actions Confirm that There Is No Event / Outcome Distinction.

The statutory construction that the word "event" includes the outcome of something that happens

---

[6] Even if Defendants were right about how the subsections of the definition of "swap" work together—and they are not—this argument would have no bearing on whether sports-related event contracts are contracts in excluded commodities because "excluded commodity" does not have the same subsections. 7 U.S.C. § 1a(19)(iv).

is further supported by both the structure of the CEA and CFTC actions. *First*, the Special Rule, 7 U.S.C. § 7a-2(c)(5)(C), confirms that Congress contemporaneously understood and intended for event contracts that relate to "outcomes" to fall within the CFTC's jurisdiction. The Special Rule directly addresses event contracts and allows the CFTC to prohibit event contracts involving any of six enumerated categories if the CFTC finds that they are "contrary to the public interest." *Id.* But the CFTC can exercise that authority only as to listings by a DCM of "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence or contingency." *Id.* In other words, a proposed DCM listing must be an event contract in the first place for the CFTC, at the second step, to have the authority to determine that the event contract would be contrary to the public interest. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statement of Sens. Lincoln and Feinstein) ("[T]his provision will strengthen the government's ability to protect the public interest from *gaming contracts and other events contracts*." (emphasis added)). Consequently, if this Court's ruling that outcomes of sports contests (or any other events) do not fall within the meaning of "event" were correct, many of these provisions would suddenly lack the obvious scope that Congress intended. *Id.* (discussing intent for "public interest" to be defined broadly to give CFTC wide latitude to decide to prohibit such contracts). For example, one of the enumerated categories in the Special Rule is war. 7 U.S.C. § 7a-2(c)(5)(C)(i)(IV). It cannot be that Congress intended to permit the CFTC to categorically bar contracts on whether Russia would invade Ukraine, but not give the CFTC the authority at the same time to bar contracts on which country will win the war. 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (event contract concerning "war" would be "contrary to the public interest"). Such a result would be contrary to the text of the statute and the clear congressional intent to give the CFTC the authority to make these decisions. *Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 930, 936 (9th Cir. 2022).

*Second*, the CFTC's rulemaking history further confirms that the reading of the word "event" to include outcomes is the correct one. The CFTC has long recognized that event contracts are regulated derivatives and that "[a] significant number of event contracts" are structured to "pay out when an ***outcome*** either occurs or does not occur." CFTC, *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008) (emphasis added). In 2008, two years before Congress amended the CEA in the Dodd-Frank Act to include the term "swap," the CFTC noted

that event contracts already came within its regulatory authority as options or futures in "excluded commodities." *Id.* at 25,670.  In particular, the CFTC noted that event contracts "can be designed to exhibit the attributes of either options or futures contracts." *Id.*  For example, in the case of options, the CFTC recognized that a "significant number of event contracts are structured as all-or-nothing binary transactions commonly described as binary options." *Id.*  Binary options (yes/no contracts) assign probabilities to discrete eventualities through market-derived prices and, as the CFTC stated, "typically pay out a fixed amount when an **outcome** either occurs or does not occur." *Id.* (emphasis added). Similarly, in 2024, the CFTC stated that "event contracts are generally understood to be a type of derivative contract, typically with a binary payoff structure, based on the **outcome** of an underlying occurrence or event."  CFTC, *Event Contracts*, 89 Fed. Reg. 48,968, 48,969 (June 10, 2024) (emphasis added).  These statements by the CFTC illustrate that the distinction between an event as a thing that happens and the outcome of an event as a thing that happens is largely theoretical, and that "outcomes" can properly be the subject of event contracts regulated by the CFTC.[7]

### 4. A Finding that Sports-Related Event Contracts Are Regulated Derivatives Would Not Mean All Sports Betting Is Illegal.

It is not the case that if sports-related event contracts on DCMs are swaps, a sports bet taken by a licensed Nevada sports book is likewise a swap, and any licensed sports book would therefore be in violation of the CEA for offering swaps outside a CFTC-designated exchange.  (*Crypto* Order at 17-18; *see also* Opp. at 13.)  As an initial matter, Robinhood is not arguing, and no one in the industry believes, that sports bets are swaps.  Indeed, Defendants' parade of horribles on this point rings hollow, as Defendants themselves recognize that the CFTC has found that the definition of "swaps" should not be construed to include arrangements that "historically have not been understood to be swaps," *Kalshi*, ECF No. 142 at 6 (filed Oct. 17, 2025), and they fail to identify any CFTC enforcement actions arising from

---

[7] For further confirmation that the CFTC interprets events to include outcomes of things that happen, *see* Vincent McGonagle (Director – Division of Market Oversight), Re: Withdrawal of CFTC Letter No. 14-130 (Aug. 4, 2022), https://www.cftc.gov/csl/22-08/download (reflecting that the CFTC withdrew recommendation of an enforcement action against academic institution offering event contracts for "binary option contracts concerning political election outcomes"); *see also* Rahul Varma (Acting Director – Division of Market Oversight), Re: Amendment of CFTC Letter No. 14-130 regarding the Operation of a Small-Scale, Not-For-Profit Market for the Trading of Event Contracts for Educational Purpose (July 14, 2025), https://www.cftc.gov/csl/25-20/download ("As stated in CFTC Letter 14-130, the Division makes clear that the Market is restricted to political events, such as contracts related to the outcomes of elections and other significant political questions not involving war, terrorism, or assassination.").

bets taken at a sports book or any statement by the CFTC suggesting it would view bets taken at a sports book as within its regulatory authority.  Moreover, 7 U.S.C. § 16(e)(1)(B)(ii) confirms that the CEA does not displace states' regulatory authority with respect to transactions that are not conducted on DCMs.  In addition, the first step in the logic fails because it is not the case that if sports-related event contracts are swaps, then so too are sports bets.  The purpose of the CEA is to create "a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [CFTC]."  7 U.S.C. § 5(b).  The products the CEA covers are *tradeable* products.  *See* CFTC, *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,217, 48,248 (Aug. 13, 2012) (describing swaps as instruments "*traded* on organized markets and over the counter" (emphasis added) and distinguishing swaps from insurance products and consumer/commercial arrangements on the basis that the latter are not traded).  Thus, sports bets are not swaps fundamentally because they are not tradeable.

### B.    Defendants' Arguments Concerning Robinhood's Likelihood of Success on the Merits Are Unavailing.

Defendants argue that (1) sports-related event contracts are not "swaps" because they are insufficiently associated with financial, economic or commercial consequences (Opp. at 9-13), and (2) even if they are, the CEA and CFTC regulations do not preempt Nevada gambling law (*id.* at 13-17).  Defendants' arguments fail for the reasons stated in this Court's order in *Kalshi*, which was well-reasoned and correctly decided.

### 1.    Defendants' Statutory Construction Arguments Are Wrong.

Defendants' arguments to try to take the relevant event contracts outside the definitions of "swap" and transactions in an "excluded commodity" under the CEA fail.  7 U.S.C. § 1a(47)(A)(ii), (19)(iv).

*First*, Defendants argue that Robinhood fails to consider the degree of relation required for an event or contingency to be "associated with" the kind of "financial, economic, or commercial consequences" required by the CEA.  (Opp. at 9.)  But wins and losses in the sporting events underlying sports-related event contracts unquestionably have potential and actual financial, economic and commercial consequences for various stakeholders.[8]  *See* Orsini Decl. ¶¶ 5-7; *see also Kalshi*, 2025

---

[8] Defendants state that "[i]t is unclear whether Robinhood permits players, teams, owners, or schools involved in the sporting event to trade on the event."  (Opp. at 10 n.5.)  However, Robinhood has protections in place to ensure that they cannot.  *See* Appendix B, Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <team> win <title>?" Contract,

WL 1073495, at *5 n.3; *KalshiEx LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025).  For example, if a sports apparel company wants to hedge exposure to merchandise demand based on playoff results, it might enter an event contract tied to a particular team making the playoffs.  The occurrence or nonoccurrence of that event or contingency will have tangible, direct financial consequences.

Sports-related event contracts are thus directly "associated with," that is, "related to," financial, economic, or commercial consequences.  *Associated*, Merriam-Webster, https://www.merriam-webster.com/dictionary/associated (defining "associated" as "related, connected, or combined together"); *Associate*, Britannica Dictionary, https://www.britannica.com/dictionary/associate ("When one thing is associated with another, they happen together or are related or connected in some way.").  The phrase "associated with" does not compel a more heightened degree of relation than what is embraced by its plain meaning.  *See Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 556 (9th Cir. 2016).

In a similar vein, Defendants invoke the *noscitur a sociis* canon to argue that the subsections of 7 U.S.C. § 1a(47)(A), when read together, "confirm[] that an event-based swap must involve an event that is inherently financial, economic, or commercial, such that it would be recognizable to the industry as a swap."  (Opp. at 11.)  As an initial matter, courts only turn to canons of construction like "*noscitur a sociis* . . . to resolve ambiguity, not create it." *Yates v. United States*, 574 U.S. 528, 564 (2015).  However, Defendants make no effort to identify any ambiguity here.  Moreover, even if it were appropriate for the Court to use this canon here, the statute's plain text refutes Defendants' construction.  Nothing in the definition of "swap" or "excluded commodity" suggests that an underlying "event" or "contingency" must be inherently financial, economic, or commercial.  Rather, the text states that an underlying "event" or "contingency" must be "associated with" a "financial, economic, or commercial *consequence*."  7 U.S.C. § 1a(47)(A)(ii) (emphasis added); *see also id.* § 1a(19)(iv) (same).  That is, an event's consequences must be "financial, economic, or commercial," not the event itself.

Defendants argue that under Robinhood's reading of the CEA, "anything and everything could be a swap where there is a conceivable downstream consequence from the event."  (Opp. at 11.)  Not so.  The

---

https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf (prohibiting current and former players, coaches, and staff of professional and collegiate sports leagues, as well as paid employees of the league, league participants, owners of teams and leagues, along with household members and immediate family members of such individuals).

definition of "swap" is broad but not boundless.  There are some transactions that, on their face, go far beyond the clear Congressional intent, such as games between friends or family members, with no "financial, economic, or commercial consequence" beyond the participants.  Moreover, the definition includes no fewer than 10 express exclusions, 7 U.S.C. § 1a(47)(B), which demonstrate that the definition is not limitless and indicate that additional exemptions should not be implied.  *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005).  Defendants may be dissatisfied with how broadly Congress defined swaps, but that is not a basis to ignore the clear meaning of the CEA.

Second, Defendants argue that the CFTC defined "swap" as excluding "consumer and commercial arrangements that historically have not been considered swaps" and should therefore exclude sports-related event contracts.  (Opp. at 12 (citing 77 Fed. Reg. 48,208 (Aug. 13, 2012)).)  These exclusions— insurance contracts, mortgages, automobile loans and employment contracts, *see* 77 Fed. Reg. at 48,217, 48,248—notably do not include event contracts, which the CFTC understood (even before the Dodd-Frank Act) to be regulated derivatives.  *See* CFTC, *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008).  Moreover, in 2024, as discussed above, the CFTC published a notice of proposed rulemaking "to further specify the types of event contracts that involve 'gaming,'" which would have amended 7 C.F.R. § 40.11 to find that certain event contracts were not "in the public interest" under the Special Rule.  CFTC, *Event Contracts*, 89 Fed. Reg. 48,968 (June 10, 2024).  Although this proposed rule was not adopted, it reflects the CFTC's understanding that event contracts involving "the outcome of a game in which one or more athletes compete" are regulated derivatives.  *Id.* at 48,975.  Thus, the CFTC's exclusion of certain consumer and commercial arrangements cannot be used to exclude sports-related event contracts from the definition of "swaps."

## 2.    Defendants' Remaining Arguments Are Foreclosed.

The Court reaffirmed its holding in *Kalshi* that 7 U.S.C. § 2(a)(1)(A) preempts state law.  (*Crypto Order* at 10.)  Defendants first assert that a presumption against preemption is appropriate here (Opp. at 13), and then contest that express, field or conflict preemption is present (*id.* at 13-17).

*Presumption Against Preemption*.  Defendants argue that a presumption against preemption should exist here because gambling is an area of regulation traditionally left to states.  (*Id.* at 13.)  However, the

relevant area of regulation is derivatives, which has been repeatedly found to preempt state gambling laws[9] and Congress has expressly brought under the exclusive jurisdiction of the CFTC.  7 U.S.C. § 2(a)(1)(A).  Moreover, while courts begin from a presumption against preemption in implied preemption cases, the presumption against preemption has no place where, as here, "the statute contains an express pre-emption clause."  *Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016) (internal quotation marks omitted).  Here, no presumption applies because the "exclusive jurisdiction" provision of the CEA expressly preempts state gambling laws to the extent they purport to regulate Robinhood's facilitation of transactions on a DCM.

*Express Preemption*.  This case involves express preemption through the "exclusive jurisdiction" provision.  7 U.S.C. § 2(a)(1)(A).  Defendants contend that express preemption requires that a federal statute contain language that contains the precise words that (1) state law is preempted, or (2) the state may not regulate the subject.  (Opp. at 13-14.)  This is simply not the law.  Courts regularly find that Congress expresses its intent to preempt state law by using phrases like "exclusive jurisdiction."  *See, e.g.*, *Genesee Cnty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1248 (D.N.M. 2011) ("Language in a statute that grants a federal agency 'exclusive authority' to regulate a particular practice indicates Congress' intent to expressly preempt state regulation of that matter.");  *AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 598 (D. Md. 2007) (finding express preemption where federal agency was given "exclusive authority").[10]

*Field Preemption*.  The scope of preemption here is the field of commodity futures and swaps trading on DCMs.  *See* 7 U.S.C. § 2(a)(1)(A).  Defendants argue that Nevada's gambling laws are not within the field that Congress intended to preempt because: (1) the "field" that Congress preempted is "core regulation of swap markets," not gambling; (2) Robinhood supposedly mischaracterizes the 1974 Conference Committee report; and (3) the CEA does not provide a comprehensive regulatory scheme that

---

[9] *See Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 205-06 (N.D. Ala. 1981) (holding that state gambling statute purporting to void all futures transactions was preempted by federal statutory scheme); *Leist v. Simplot*, 638 F.2d 283, 304 (2d Cir. 1980) (reflecting that, despite attacks on "gambling" in the grain trade, Congress consistently recognized the benefits of legitimate speculation and trade).

[10] Defendants' argument pointing to express preemption language in some parts of the statute does not foreclose the possibility that the statute may nevertheless have some implied preemptive effect.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287-89 (1995).

thoroughly occupies the field.  (Opp. at 14-16.)  *First*, Defendants' entire field preemption analysis assumes, incorrectly, that sports-related event contract trading is gambling, and that the CEA preempts all gambling laws.  When sports-related event contracts are properly understood as regulated derivatives, then sports-related event contracts trading on DCMs fall within the field that Defendants agree Congress intended to preempt—the "core regulation of swaps markets." (Opp. at 16).  For more than 100 years, the Supreme Court has understood that lawmakers intended for regulated derivatives to be treated differently from ordinary wagers.  *See Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905).  The CFTC maintains the same understanding of congressional intent to this day.  *See Event Contracts*, 89 Fed. Reg. at 48,981.  *Second*, Defendants themselves recite the 1974 Conference Committee statement that "the Conferees do not contemplate that there will be a need for any supplementary regulation by the States." (Opp. 15.)  This is a clear expression of Congressional intent to preempt parallel regulation by the states.  Defendants' reasoning—that sports betting was illegal in most states at the time[11]—is no basis to ignore this statement.  "Any supplementary regulation" means any regulation in addition to federal law regulating futures trading within the exclusive jurisdiction of the CFTC, as stated in the preceding sentence of the Conference Committee report.  (*Id.*)  *Third*, the CFTC's regulation of commodity futures and swaps trading on DCMs is assuredly comprehensive, as shown by the thicket of regulations that govern DCMs like Kalshi and FCMs like Robinhood.  Accordingly, this Court correctly decided that the plain text of 7 U.S.C. § 2(a)(1)(A) likely "reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." *Kalshi*, 2025 WL 1073495, at *6; *see also Flaherty*, 2025 WL 1218313, at *5.

*Conflict Preemption.*  Because the Court correctly held and reaffirmed that the CEA occupies the relevant field of regulation, it need not address Defendants' additional preemption arguments.  Nevertheless, they fail as well.  Defendants argue that Robinhood has not shown that it would be impossible to comply with Nevada's gaming laws and the CEA (Opp. at 16-17), nor that gaming laws present an obstacle to Congress's purpose in enacting the CEA (*id.* at 17).  Implied conflict preemption exists in two instances: "where it is impossible for a private party to comply with both state and federal law" (impossibility preemption), or where "the challenged state law stands as an obstacle to the

---

[11] Obviously, sports betting was already legal at that time in Nevada.  (*See* Opp. at 4.)

accomplishment and execution of the full purposes and objectives of Congress" (obstacle preemption).  *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (internal quotation omitted).

The Court's field preemption finding means there is no need to consider conflict preemption. *Kalshi*, 2025 WL 1073495, at *6 n.6.  If the Court does, state prosecutions for conduct on CFTC-designated exchanges would clearly present an obstacle to the CEA's purpose.  By granting the CFTC "exclusive jurisdiction" over DCMs, including the authority to approve contracts for listing under the Special Rule, Congress expressly intended to exclude all other attempts to regulate transactions on those exchanges, including Defendants' threatened enforcement here.  *See DGM Invs., Inc. v. New York Futures Exch., Inc.*, 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) ("When application of state law would directly affect trading on or the operation of a futures market, it . . . is preempted.").  The statutory design and legislative history of the CEA clearly show that "Congress intended to subject" futures and commodities "to only one set of regulations."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992).  For those reasons, Nevada's state gambling laws, as applied to sports-related event contracts traded on DCMs, would present an obstacle to uniform federal regulation under the CFTC.  Accordingly, Robinhood is likely to succeed on the merits of its claims that Nevada's state gambling laws are preempted by the CEA and CFTC regulations.

## II.    Robinhood Will Be Irreparably Harmed If Defendants Are Permitted to Enforce Preempted State Gambling Laws.

Robinhood will be irreparably harmed absent an injunction.  Defendants' cease-and-desist letter states their intent to prosecute Robinhood for conduct that is within the CFTC's exclusive jurisdiction. Defendants have never disclaimed this intention.  To the contrary, they plainly acknowledge "the threat of criminal and civil sanctions and reputational harm" absent an injunction and do not dispute that such harm is substantial, imminent and all-but-certain to occur.  (Opp. at 18.)    Nevertheless, Defendants maintain that an injunction should be denied because any resulting harm would be "wholly a function of [Robinhood's] own actions in contravention of Nevada law."  (*Id.*)

This argument is unpersuasive.  The Court has already found that Nevada's gambling laws are preempted by the CEA, and a credible threat of prosecution pursuant to a preempted state statute is sufficient to establish irreparable harm.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381

(1992).  Further, given the Board's demand that Robinhood comply with preempted state law, Robinhood cannot avoid irreparable harm without a preliminary injunction.  The State's threatened enforcement creates a Catch-22:  If Robinhood continues offering access to event contracts in Nevada, it will face civil and criminal prosecution and costly sanctions.  If Robinhood stops offering access to event contracts, it will lose the confidence, business, and goodwill of more than 14,000 customers in Nevada who currently rely on Robinhood's services.  Such losses cannot readily be remedied with damages, and even if they could be, sovereign immunity bars Robinhood from collecting lost profits from the State under any circumstances.  *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999).

Importantly, Defendants are not harmed by the entry of an injunction; they have a remedy under the APA for any claimed incursion on their right to regulate sports gambling in Nevada.  *See Ramsey v. Kantor*, 96 F.3d 434, 445 (9th Cir. 1996).  An injunction is the only means of avoiding imminent, irreparable harm to Robinhood, and Defendants have offered no evidence of harm to anyone else.

### III. Defendants and the Public Have No Interest in the Enforcement of Preempted State Laws.

Finally, the equities tip in Robinhood's favor.  The State of Nevada and the public can have no interest in enforcing preempted state laws against Robinhood.  *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).  Moreover, the public interest weighs in favor of maintaining the status quo, which is access by Robinhood's customers to event contract trading on a DCM.  *See Chalk v. United States Dist. Court Cent. Dist.*, 840 F.2d 701, 704 (9th Cir. 1988).

Robinhood's customers' trading activity is conducted pursuant to (and in reliance on) the centralized regulatory regime Congress enacted through the CEA.  Congress brought event contracts under a unified set of regulations to avoid "the possibility that another State would have different rules than not only [] the CFTC, but other States."  *Kalshi*, 2025 WL 1073495, at *7.  By enacting the CEA, Congress has already decided that the public interest is best served by centralized regulation of transactions on DCMs.  *See Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1046 (D. Idaho 2025).

### CONCLUSION

For the reasons set forth above, the Court should grant Robinhood's motion for a preliminary injunction.

DATED this 21st day of October, 2025.

PISANELLI BICE PLLC

By:  /s/ Todd L. Bice
　　　Todd L. Bice, Esq., #4534
　　　400 South 7th Street, Suite 300
　　　Las Vegas, Nevada 89101

　　　Kevin J. Orsini, Esq.
　　　(*pro hac vice pending*)
　　　Antony L. Ryan, Esq.
　　　(*pro hac vice pending*)
　　　Brittany L. Sukiennik, Esq.
　　　(*pro hac vice pending*)
　　　CRAVATH, SWAINE & MOORE LLP
　　　375 Ninth Avenue
　　　New York, New York 10001

*Counsel for Plaintiff*
*Robinhood Derivatives, LLC*

21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2025, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

_/s/ Kimberly Peets_
An employee of Pisanelli Bice PLLC