AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General—
  Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada,
  Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov

ANDERSEN BEEDE WEISENMILLER
Ryan A. Andersen, Esq.
Nevada Bar No. 12321
Email: ryan@abwfirm.com
Mark M. Weisenmiller, Esq.
Nevada Bar No. 12128
Email: mark@abwfirm.com
3199 E Warm Springs Rd., Ste 400
Las Vegas, Nevada 89120
Phone: 702-522-1992
Fax: 702-825-2824

*Attorneys for Mike Dreitzer, George Assad, Chandeni K. Sendall, Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, Nevada Gaming Commission, and Aaron D. Ford*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ROBINHOOD DERIVATIVES, LLC, | Case No. 2:25-cv-01541-APG-DJA |
| Plaintiffs, | |
| vs. | |
| MIKE DREITZER, in his official capacity as Chairman of the Nevada Gaming Control Board, et al. | |
| Defendants. | Hearing Date: November 14, 2025<br>Hearing Time: 9:30 a.m. |

**SURREPLY TO CORRECTED REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF ROBINHOOD'S MOTION <u>FOR A PRELIMINARY INJUNCTION</u>**

Mike Dreitzer, in his official capacity as Chairman of the Nevada Gaming Control Board, George Assad, in his official capacity as a Member of the Nevada Gaming Control Board, Chandeni K. Sendall, in her official capacity as a Member of the Nevada Gaming Control Board, Nevada Gaming Control Board, a subdivision of the State of Nevada, Jennifer Togliatti, in her official capacity as Chair

of the Nevada Gaming Commission, Rosa Solis-Rainey, in her official capacity as a Member of the Nevada Gaming Commission, Brian Krolicki, in his official capacity as a Member of the Nevada Gaming Commission, George Markantonis, in his official capacity as a Member of the Nevada Gaming Commission, Nevada Gaming Commission, a subdivision of the State of Nevada, and Aaron D. Ford, in his official capacity as Attorney General of Nevada (collectively, "**Nevada Defendants**"), by and through their counsel of record, the State of Nevada, Office of Attorney General, and Andersen Beede Weisenmiller, hereby submit their sur-reply ("**Sur-Reply**") to the *Corrected Reply Memorandum of Points and Authorities in Support of Plaintiff Robinhood's Motion for a Preliminary Injunction* [Dkt. No. 59] ("**Reply**"), filed by Robinhood Derivatives, LLC ("**Robinhood**") on October 21, 2025.

This Sur-Reply is made and based upon the following Memorandum of Points and Authorities, the papers, pleadings, and other documents filed on the docket, judicial notice of which is respectfully requested pursuant to FRE 201,[1] and any argument made, and evidence submitted, at any hearing on the Motion.[2]

**MEMORANDUM OF POINTS AND AUTHORITIES**
**I.**
**INTRODUCTION**

On April 9, 2025, this Court issued a preliminary injunction barring Nevada from enforcing its gaming laws against the sports-outcome-based event contracts listed on KalshiEX, LLC's ("**Kalshi**") designated contract market ("**DCM**") on the basis that the Commodity Exchange Act ("**CEA**") likely preempts state regulation of "swaps" on a DCM registered with the Commodity Futures Trading Commission ("**CFTC**"). See Dkt. No. 45 ("**Kalshi Order**") in *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW (hereinafter "***Kalshi v. State of Nevada***").

Following this Court's entry of the Kalshi Order, Robinhood activated its Nevada customers' access to sports-outcome-based event contracts trading on Kalshi's DCM. Robinhood activated its

---

[1] All references to "**FRCP**" are to the Federal Rules of Civil Procedure. All references to "**FRE**" are to the Federal Rules of Evidence. All references to "**Local Rule**" are to the Local Rules of Practice for the United States District Court for the District of Nevada. When used herein, all references to "**Dkt. No.**" are to the numbers assigned to the documents filed in the case as they appear on the docket in the above-captioned case, denominated Case No. 2:25-cv-01541-APG-DJA.

[2] "**Motion**" as used herein refers to *Plaintiff Robinhood's Motion for a Temporary Restraining Order and Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof* [Dkt. No. 7], filed by Robinhood on August 19, 2025.

Nevada customers' access to trade sports-outcome-based event contracts, notwithstanding that it knew that the Nevada Defendants would consider such activation a violation of Nevada law. See Dkt. No. 1 ("**Complaint**"), ¶¶ 6-7. Then, on August 19, 2025, Robinhood filed its Complaint, seeking a preliminary injunction and declaratory relief to enjoin state enforcement, on the basis that the terms of the CEA preempted Nevada gaming laws with respect to "swaps" and "excluded commodities" traded on DCMs. Robinhood argued that the sports-outcome-based event contracts traded on Kalshi's DCM "are within these statutory definitions of swaps and transactions in excluded commodities." See Complaint, ¶¶ 52-54. Robinhood also submitted evidence (albeit inadmissible hearsay) that it asserted demonstrated that "the underlying sporting events they concern have economic consequence[]" as required to meet the statutory definitions of swaps and excluded commodities. See Motion, p. 21, ll. 1-20; Dkt. No. 9.

Following the filing of the Motion by Robinhood, this Court addressed in *North American Derivatives Exchange, Inc. v. The State of Nevada, et. al.*, Case No. 2:25-CV-00575-APG-BNW ("***Crypto.com v. State of Nevada***") the same issues it addressed in *Kalishi v. State of Nevada*. In *Crypto.com v. State of Nevada*, this Court denied Crypto's preliminary injunction motion, holding that: (i) event contracts based on sporting outcomes are not "swaps" under the CEA; (ii) the CEA does not preempt state gaming laws; (iii) Crypto had no likelihood of success on the merits; (iv) allowing Crypto to offer sports wagers guised as swaps on its exchange unfettered by state regulation imposes substantial hardship upon Nevada; and (v) the public has an interest in ensuring that unlicensed sports wagering does not occur on CFTC-designated changes, as that would be contrary to the CEA, congressional intent, CFTC regulations, and Nevada law. See Dkt. No. 105 ("**Crypto Order**"), pp. 20-21.

Upon the entry of the Crypto Order, Robinhood pivoted, arguing in its Reply that this Court lacks authority to interpret terms in the very provisions of the CEA it asked this Court to interpret for preemption purposes. As explained below, Robinhood raises no meaningful factual distinction between the sports-outcome-based event contracts it offers and those offered by Crypto, and its collateral attacks on the Crypto Order fail as a matter of law.


This Court's decision in *Crypto.com v. State of Nevada* is dispositive of the Motion. Robinhood, a registered FCM, facilitates the placement and liquidation of sports-outcome-based event contracts for its users that trade on Kalshi's DCM. See Motion, p. 10, ll. 17-27; Dkt. 8, ¶ 5. Kalshi's contracts have the same key features as Crypto's event contracts. They are wagers on the outcomes of sporting and other events – for example, whether a particular team will win a particular game and even by how many points. See Dkt. No. 1 in *Kalshi v. State of Nevada*, ¶¶ 45 & 53. In light of the foregoing, Robinhood cannot show a likelihood of success on the merits – either on the question of whether its event contracts are "swaps" or "excluded commodities" or the CEA preempts all state gaming law.

Further, Robinhood cannot show irreparable harm. Robinhood knowingly and purposefully violates Nevada state law by engaging in sports wagering without a license and it is not harmed if Nevada Defendants seek to enforce Nevada state law. The balance of equities and the public interest decisively favor the Nevada Defendants. Every day that the Nevada Defendants are unable to enforce Nevada's gaming laws, Robinhood's conduct inflicts irreparable harm upon the state, the members of the gaming industry, and the public. Therefore, the Motion should be denied.

## II.
## SUR-REPLY

**A.   Robinhood's Argument that this Court Lacks Authority to Determine the Meaning of "Swaps" is Without Merit.**

Robinhood argues in its Reply that this Court lacks authority to determine the meaning of "swaps" because Congress intended the CFTC, not the courts, to decide what is a swap and the CFTC has already decided that sports-outcome-based event contracts are swaps. See Reply, pp. 8-11. However, as this Court correctly held in the Crypto Order, the CEA does not delegate to the CFTC the exclusive power to define "swaps." See Crypto Order, p. 11, ll. 5-12.

The CEA grants the CFTC exclusive jurisdiction only over swaps once properly so defined. See Crypto Order, p. 10, ll. 17-19 ("But to fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A), the listed item must be a 'swap[] or contract[] of sale of a commodity for future delivery . . . traded or executed on" a DCM.'"). The CEA makes clear that "[n]othing in the CEA takes statutory interpretation away from courts." See Crypto Order, p. 11, ll. 15-17 (citing 7 U.S.C. § 2(a)(1)(A) ("Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United

States or any State"). Thus, this Court correctly observed that determining whether a contract is a "swap" is a threshold statutory question, not an APA review issue. See Crypto Order, p. 11, ll. 12-17.

In the Reply, Robinhood argues that this Court's ruling in the Crypto Order "was an error because it effectively finds that the CFTC … is acting unlawfully and beyond its congressionally delegated authority, a finding that would only be proper in a direct challenge to the CFTC's actions under the Administrative Procedure Act ("APA")." See Reply, p. 7, ll. 16-20. However, as was the case in *Crypto.com v. State of Nevada*, no CFTC order or rule defining "swap" is challenged here. See Crypto Order, p. 11, ll. 18-20 ("I have been presented with no agency fact finding or reasoned interpretation regarding whether these contracts are swaps."). Nevada Defendants simply seek to enforce their own laws where CFTC jurisdiction never attached. The APA governs review of final agency action – it does not bar courts from deciding whether an agency had jurisdiction in the first place. See Loper Bright Enterprises v. Raimondo, 144 S. Ct. 2244, 2258 (2024) (the interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function).

The United States Supreme Court in Bates held that a court must interpret the terms of a federal statute to determine whether the federal statute preempts state law and to what extent. See Bates v. Dow Agrosciences LLC, 125 S. Ct. 1788 (2005). In 2000, pursuant to its authority under the Federal Insecticide, Fungicide, and Rodenticide Act ("**FIFRA**"), the Environmental Protection Agency ("**EPA**") conditionally registered Strongarm, a pesticide manufactured and sold by DOW Agrosciences LLC ("**DOW**"), thereby granting DOW permission to sell its pesticide in the United States. See id., at 1793. DOW reregistered its Strongarm label with the EPA before the 2001 growing season and the EPA approved a "supplemental" label that was for distribution and use only in the states of New Mexico, Oklahoma, and Texas. See id.

Following notice that peanut farmers from Texas intended to bring suit against DOW, DOW filed a declaratory judgment action in federal district court, asserting that the Texas farmers' state law claims were expressly or impliedly preempted by FIFRA. See id. In response, the Texas farmers brought counterclaims, including tort claims sounding in strict liability and negligence, as well as claims for fraud, breach of warranty, and violation of the Texas Deceptive Trade Practices–Consumer

Protection Act ("**DTPA**"). See id. The United States District Court for the Northern District of Texas ("**District Court**") granted DOW's motion for summary judgment, rejecting one claim on state-law grounds and dismissing the remainder as expressly preempted by 7 U.S.C. § 136v(b), which provided that States "shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter," and the United States Court of Appeals for the Fifth Circuit ("**Fifth Circuit**") affirmed the District Court's decision. See id., at 1793-94.

The Supreme Court interpreted the statutory phrases "requirements for labeling or packaging" and "in addition to or different from those required under this subchapter" to determine whether the challenged state rules fell within the field that Congress preempted, reversed, and remanded in part. The Supreme Court held that the prohibitions in § 136v(b) apply only to "requirements," and found that the Fifth Circuit committed error because an occurrence that merely motivates an optional decision does not qualify as a "requirement." See id., at 1798. The Supreme Court also found that the Fifth Circuit was correct in holding that the "term 'requirements' in § 136v(b) reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties[,]" which the Supreme Court found was the best reading of § 136v(b). See id.

The Supreme Court clarified, "[t]hat § 136v(b) may pre-empt judge-made rules, as well as statutes and regulations, says nothing about the scope of that pre-emption." See id. Based upon the Supreme Court's interpretation of the terms "requirements for labeling or packaging" and "in addition to or different from those required under this subchapter," the Supreme Court held that the Texas farmers' claims for defective design, defective manufacture, negligent testing, and breach of express warranty were not preempted. See id., at 1799. In contrast, the Texas farmers' claims for fraud and negligent-failure-to-warn were preempted because they were premised on common-law rules that qualify as "requirements for labeling or packaging." See id., at 1799-1800.

Like the Supreme Court in Bates, the Ninth Circuit has interpreted the terms of a federal statute to determine whether the federal statute preempts state law and to what extent. See Stengel v. Medtronic Inc., 704 F.3d 1224 (9th Cir. 2013) (interpreting whether "parallel" state law requirements fell within the preemption provision of the Medical Device Amendments ("**MDA**") to the Food, Drug,

and Cosmetic Act ("**FDCA**") that preempted state requirements that were "different from, or in addition to any requirement applicable under this chapter."). Thus, this Court has the authority and must interpret the meaning of the terms of the CEA, including "occurrence," "swap," "contingency," and "excluded commodities," to determine, as Robinhood has asked this Court, whether the CEA preempts Nevada gaming law.

Moreover, Robinhood's argument that the CFTC's inaction equals final agency action subject to challenge only under the APA is incorrect. APA claims require "final agency action." See 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). The term "action" "is meant to cover comprehensively every manner in which an agency may exercise its power." See Whitman v. Am. Trucking Associations, 121 S. Ct. 903, 915 (2001). The phrase "final agency action" "requires that the action under review 'mark the consummation of the agency's decisionmaking process.'" Id. Only if the agency "has rendered its last word on the matter in question, … is its action 'final' and thus reviewable." Id.

As this Court explained in *Crypto.com v. State of Nevada*, CFTC nonaction under 7 U.S.C. § 7a-2(c) does not constitute a final agency determination that an event contract qualifies as a "swap." "In addition to this general prohibition [of swaps that involve, relate to, or reference … gaming, or an activity that is unlawful under any Federal or state law set forth in 17 C.F.R. 40.11(a)(1)] on the front end, the CFTC's regulation provides a review process through which it can determine on the back end whether an event contract that was listed despite the prohibition involves a prohibited activity" under 17 C.F.R. § 40.11(c). See Crypto Order, pp. 4-5. Thus, the statutory "self-certification" regime allows exchanges to list contracts *at their own risk*; the CFTC may later reject the listing. See 17 C.F.R. § 40.11(c)(1)-(2).

Robinhood's reliance upon Big Lagoon is also misplaced. In Big Lagoon, the Ninth Circuit in 2015 held that the State of California could not collaterally attack a 1994 final decision of the Bureau of Indian Affairs' ("**BIA**") to take an eleven-acre parcel into trust for the Big Lagoon Rancheria, or the tribe's federally recognized status during compact negotiations under the Indian Gaming Regulatory

Act ("**IGRA**").  See Big Lagoon Rancheria v. California, 789 F.3d 947, 952-54 (9th Cir. 2015), *as amended on denial of reh'g* (July 8, 2015).  The Ninth Circuit panel reasoned that such challenges must be brought under the APA within six years of the agency's final decision and, thus, California's claims were time-barred and procedurally improper.  See id., at 953–54.

Big Lagoon is factually and legally distinct.  The Ninth Circuit panel determined that an APA claim was required because "[t]he Supreme Court has explained that a challenge to the BIA's 'decision to take land into trust' is 'a garden-variety APA claim.'"  See id., at 952-53.  However, Robinhood sued the Nevada Defendants here, seeking a preliminary injunction and declaratory relief that the CEA preempts Nevada gaming laws that the Nevada Defendants have sought to enforce against Robinhood.  The BIA's decisions to take the eleven-acre parcel into trust and its designation of Big Lagoon Rancheria as an Indian tribe were final agency actions that were time-barred under the APA.  Here, the CFTC has taken no action with respect to the sports-outcome-based event contracts, either by approving them to be listed on DCMs or defining swaps.  Therefore, Robinhood's argument that this Court lacks authority to interpret the meaning of "swap" as used in the CEA should be rejected.

**B.   Contracts Based on Sports Outcomes Are Not "Swaps," "Contingencies," or "Excluded Commodities" Under the CEA.**

Robinhood also argues that this Court committed an error in the Crypto Order when it held that event contracts based upon the outcome of sports are not "swaps" under the CEA.  See Reply, p.13, ll. 3-14.  The basis of Robinhood's argument is that "event" and "occurrence" mean the same thing, even though they are both used in the definition of "swap."  See id., pp. 8-13.  This argument has no merit.

This Court's "occurrence vs. outcome" distinction in the Crypto Order is textual, contextual, and supported by statutory canons.  Because the CEA did not define "occurrence" or "event," this Court set out to "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute."  See Crypto Order, p. 12, ll. 1-3.  To do so, this Court referred to dictionaries from the relevant time to aid in its ordinary meaning analysis.  See id., ll. 4-5.

Robinhood does not object to this Court's reliance upon dictionaries to interpret the ordinary meaning of "occurrence" and "event."  However, because dictionary definitions of "occurrence" and "event" sometimes overlap, Robinhood concludes that "occurrence" and "event" *can* mean the same

thing. See Reply, p. 14, ll. 2-17. Yet, Robinhood ignores the other cannons of statutory construction that guided this Court's interpretation of "occurrence" and "event" in the Crypto Order.

In the Crypto Order, this Court explained that the Court must interpret different words used in the same statute ("occurrence," "event," and "contingency") to convey different meanings and, therefore, could not interpret occurrence and event to both mean anything that happens. See Crypto Order, p. 14, ll. 5-14 (citing S.E.C. v. McCarthy, 322 F.3d 650, 656 (9th Cir. 2003)). And, if every occurrence or happening is an event, then "the statutory words either have no meaning or have such a broad meaning that they would render superfluous other portions of the CEA's definition of a swap." See Crypto Order, p. 16, ll. 10-14 (citing Corley v. United States, 556 U.S. 303, 314 (2009)).

Considering the ordinary meaning of the text of the statutes and the foregoing cannons of statutory interpretation, this Court correctly held in the Crypto Order that the ordinary meaning of "occurrence is something happened" and the ordinary meaning of "event is a happening of some significance that took place or will take place, in a certain location, during a particular interval of time …." See Crypto Order, pp. 14, ll. 11-17, & 15, ll. 1-6. Thus, this Court should reject Robinhood's argument that Congress intended "occurrence" and "event" to be synonymous.

This Court should also reject Robinhood's argument that sports-outcome-based contracts are swaps because they count as a "contingency." See Reply, p. 16. As this Court explained in the Crypto Order, contingency means a "contingent event." See Crypto Order, p.15, fn. 9. Many dictionaries and the canons of statutory construction support that interpretation. See id. Further, this Court's reasoning that "contingency" was intended by Congress to have a distinct meaning from "occurrence" and "event" is not overcome because "occurrence" and "contingency" are grouped without reference to "event" in 7 U.S.C. § 7a-2, as Robinhood claims. "Event" is, in fact, referred to in 7 U.S.C. § 7a-2. Furthermore, this Court must not read the words of a statute in a vacuum: it must read the words with a view of their place in the overall statutory scheme. See Crypto Order, p. 12, ll. 10-13.

This Court should also reject Robinhood's argument that Nevada gaming law is preempted because sports-outcome-based contracts are "excluded commodities." See Reply, pp.16-17. First, Robinhood's theory contradicts the language of the CEA, its legislative history, and the CFTC's own

2011 rulemaking recognizing that "gaming" remains primarily a matter of state regulation. As this Court held in the Crypto Order, Congress enacted the special rule granting the CFTC authority to determine whether "event contracts" and "swap contracts" in excluded commodities are contrary to the public interest. 7 U.S.C. § 7a- 2(c)(5)(C)(i). Pursuant to that authority, the CFTC made that public interest determination on a blanket basis when it promulgated 17 C.F.R. § 40.11(a), which prohibits DCMs from listing agreements, contracts, transactions, or swaps based upon an excluded commodity that "involves, relates to, or references . . . gaming," "an activity that is similar to" gaming, and "an activity that is unlawful under any State or Federal law." See 17 C.F.R. § 40.11(a)(1).

Second, even if the sports-outcome-based contracts are transactions in "excluded commodities," the CFTC does not have exclusive jurisdiction because the transactions do not involve "contracts of sale of a commodity for future delivery" as required by 7 U.S.C. § 2(a)(1)(A). Therefore, there is no merit to Robinhood's argument that the CEA preempts Nevada gaming law with respect to its sports-outcome-based contracts.

### III.
### CONCLUSION

Based upon the foregoing, this Court should deny the Motion and grant any other relief appropriate under the circumstances.

Dated this the 31st day of October 2025.    **ANDERSEN BEEDE WEISENMILLER**

By: */s/ Mark M. Weisenmiller*
Mark M. Weisenmiller, Esq.
*Attorneys for Nevada Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2025, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Mark M. Weisenmiller*
An employee of Andersen Beede Weisenmiller